## No. 23-1070

IN THE
United States Court of Appeals for the Tenth Circuit
_____

ESTATE OF JEFFREY MELVIN,

Plaintiff-Appellee,

v.

CITY OF COLORADO SPRINGS, COLORADO;
DANIEL PATTERSON, in his individual capacity; and
JOSHUA ARCHER, in his individual capacity,

Defendants-Appellants.

_____

On Appeal from the
United States District Court for the District of Colorado
Civil Action No. 20-cv-00991-CMA-MDB
(Hon. Christine M. Arguello)
_____

**OPENING BRIEF**
_____

ANNE H. TURNER
OFFICE OF THE CITY ATTORNEY OF
THE CITY OF COLORADO SPRINGS
30 South Nevada Avenue, Suite 501
Colorado Springs, Colorado 80903
(719) 385-5909

Attorney for Defendants-Appellants

ORAL ARGUMENT IS REQUESTED
SCANNED PDF FORMAT ATTACHMENTS ARE INCLUDED

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... iii

PRIOR OR RELATED APPEALS ........................................................vi

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES.............................................................6

STATEMENT OF THE CASE.................................................................7

SUMMARY OF THE ARGUMENT ....................................................22

ARGUMENT .......................................................................................23

**I.   The District Court erred when finding that a reasonable jury could conclude that the Officers violated Melvin's constitutional rights.........................................................................23**

    A. The Officers are entitled to qualified immunity because they did not use excessive force on Melvin. ...............................................23

    B. Multiple, repeated Taser deployments on an individual who, like Melvin, is not subdued or under the Officers' control are objectively reasonable. ...........................................................25

    C. *None* of the Officers' uses of force enabled them to subdue and detain Melvin...............................................................................34

**II.  The District Court erred when finding it was clearly established on April 26, 2018 that deploying a Taser eight times in approximately 90 second on an actively resisting subject who, over the course of 7 minutes, defied all orders to surrender for handcuffing violates the Fourth Amendment................................38**

    A. No officer deployed his Taser eight times. ..................................39

    B. This court explicitly has not "set a specific limit on the number of times an arrestee may be tased within a given time interval.".................40

C. The principle that the "disproportionate use of a Taser on a nonviolent arrestee not suspected of a serious crime constitutes excessive force" misstates the law and is far too general to apprise the Officers of the unconstitutionality of their Taser deployments ............................................................................................... 42

**III. The District Court erred when denying summary judgment to the City because Melvin's constitutional rights were not violated. ........................................................................................................... 44**

CONCLUSION ........................................................................................... 44

STATEMENT REGARDING ORAL ARGUMENT ............................................. 44

CERTIFICATE OF COMPLIANCE ................................................................. 46

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS ............................................................................................. 47

CERTIFICATE OF SERVICE ....................................................................... 48

ATTACHMENT

Order Denying Defendants' Motions for Summary Judgment, *Estate of Jeffrey Melvin v. City of Colo. Springs, Colo. et al.*, No. 20-cv-00991-CMA-MDB (D. Colo. Mar. 8, 2023)

## TABLE OF AUTHORITIES

Page

**CASES**

*Behrens v. Pelletier*,
　　516 U.S. 299 (1996) ...............................................................24

*Bryan v. MacPherson*,
　　630 F.3d 805 (9th Cir. 2010) ...............................................32

*Carabajal v. City of Cheyenne*,
　　847 F.3d 1203 (10th Cir. 2017) ...........................................24

*Casey v. City of Federal Heights*,
　　509 F.3d 1278 (10th Cir. 2007) ................................. 21, 35, 40, 42, 43

*Cavanaugh v. Woods Cross City*,
　　625 F.3d 661 (10th Cir. 2010) ................................. 21, 40, 41, 42, 43

*Clark v. Bowcutt*,
　　675 Fed. App'x 799 (10th Cir. 2017) ...................................24

*Coronado v. Olsen*, No. 20-4118,
　　2022 WL 152124 (10th Cir. Jan. 18, 2022) (unpublished) ......................... 43-44

*Crowson v. Washington Cnty. Utah*,
　　983 F.3d 1166 (10th Cir. 2020) ..............................................2, 4, 44

*Davenport v. Causey*,
　　521 F.3d 544 (6th Cir. 2008) ...............................................25

*District of Columbia v. Wesby*,
　　-- U.S. --, 138 S. Ct. 577 (2018) ........................................... 38-39, 43

*Edwards v. City of Muskogee, Okla.*,
　　841 Fed. App'x 79 (10th Cir. 2021) ............................... 25, 26, 28-29, 30, 43, 44

*Est. of Valverde v. Dodge*,
　　967 F.3d 1049 (10th Cir. 2020) ...........................................2, 3, 31, 34

*Graham v. Connor*,
490 U.S. 386 (1989)................................................................. 17, 24, 25, 27, 28

*Hagans v. Franklin County Sheriff's Office*,
695 F.3d 505 (6th Cir. 2012) ...............................................................27

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982)............................................................................23

*Heard v. Dulayev*,
29 F.4th 1195 (10th Cir. 2022) ..................................................3, 39, 43

*Helvie v. Jenkins*,
66 F.4th 1227 (10th Cir. 2023) .......................................................33, 38

*Hinton v. City of Elwood, Kan.*,
997 F.2d 774 (10th Cir. 1993) ...................................... 26, 27, 28, 29, 30, 43, 44

*Mitchell v. Forsyth*,
472 U.S. 511 (1985) ......................................................................1, 23

*Moore v. City of Wynnewood*,
57 F.3d 924 (10th Cir. 1995) ..........................................................4, 44

*Perea v. Baca*,
817 F.3d 1198 (10th Cir. 2016) ........................ 21, 26, 27, 28, 30, 31, 41, 42, 43

*Phillips v. James*,
422 F.3d 1075 (10th Cir. 2005) ...........................................................25

*Ryburn v. Huff*,
565 U.S. 469 (2012)............................................................................25

*Smith v. Ray*,
781 F.3d 95 (4th Cir. 2015) ..........................................................32, 34

*Surat v. Klamser*,
52 F.4th 1261 (10th Cir. 2022) ..............................1, 2, 3, 8, 23, 24, 38

*Swint v. Chambers Cnty. Comm'n*,
514 U.S. 35 (1995)...............................................................................4

*Waters v. Coleman*,
632 Fed. App'x 431 (10th Cir. 2015) ..................................................................44

*Wilson v. City of Lafayette*,
510 Fed. App'x 775 (10th Cir. 2013) ..................................................................44

*Youbyoung Park v. Gaitan*,
680 Fed. App'x 724 (10th Cir. 2017) .......................................................7, 22, 35

## STATUTES

28 U.S.C. § 1291 ...............................................................................................1

28 U.S.C. § 1331 ...............................................................................................1

28 U.S.C. § 1343 ...............................................................................................1

42 U.S.C. § 1983 ...........................................................................................1, 4

## OTHER AUTHORITIES

Federal Rule of Appellate Procedure 4(a)(1)(A) ......................................................5

## PRIOR OR RELATED APPEALS

None.

## JURISDICTIONAL STATEMENT

### District Court Jurisdiction

The District Court's subject-matter jurisdiction arose under 28 U.S.C. §§ 1331 and 1343, because Plaintiff alleged that Defendants violated Jeffrey Melvin's rights under the Fourth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983. (App. at 35)

### Appellate Jurisdiction Over The Individual Defendants' Appeals

This Court's jurisdiction arises under 28 U.S.C. § 1291 because the individual Defendants-Appellants (Daniel Patterson and Joshua Archer (the "Officers")) appeal from the denial of their motions for summary judgment based on qualified immunity, which is a final decision. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). The denial of a defense of qualified immunity that turns on abstract issues of law is immediately appealable on an interlocutory basis pursuant to the collateral order doctrine. *Id.*; *Surat v. Klamser*, 52 F.4th 1261, 1269 (10th Cir. 2022). "Abstract issues of law are limited to '(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation' and '(2) whether that law was clearly established at the time of the alleged violation.'" *Surat*, 52 F.4th at 1269 (citation omitted).

The Officers' appeals ask this Court to answer both of these abstract questions of law. First, accepting as true the facts that the District Court concluded a reasonable

1

jury could find, did the Officers violate Jeffrey Melvin's constitutional rights? Was the force they utilized to detain Melvin reasonable, where before seeking to detain Melvin, the Officers, at most, reasonably suspected him of committing obstruction (App. at 526); before the Officers sought to detain him, Melvin posed no immediate threat to the safety of himself or others (*id.*); and after Officer Patterson ordered Melvin to turn around and put his hands behind his back, "Melvin resisted arrest, struggled with the Officers, and failed to comply with repeated commands to stop, to get down, and to put his hands behind his back" (*id.* at 527). This is a purely legal question within this Court's jurisdiction on an interlocutory appeal. *See, e.g., Surat*, 52 F.4th at 1270 (concluding that the Tenth Circuit has "jurisdiction to determine 'whether the facts that the district court ruled a reasonable jury could find would suffice to show'" that an officer's use of force during an arrest was reasonable on the constitutional violation prong of qualified immunity (citation omitted)); *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1181 (10th Cir. 2020) (reversing summary judgment order denying qualified immunity to an individual defendant because he did not violate the plaintiff's constitutional rights); *Est. of Valverde v. Dodge*, 967 F.3d 1049, 1064 (10th Cir. 2020) (same).

Second, the Officers also ask this Court whether it was clearly established as of April 26, 2018, "that deploying a Taser 8 times in approximately 90 seconds at Mr. Melvin, under the circumstances of this case, was violative of the Fourth

2

Amendment." (App. at 532) Defendants acknowledge that the Court, again, must accept as true the facts that the District Court concluded a reasonable jury could find when answering this question. But whether the law was clearly established at the time of the alleged violation is an abstract issue of law that this Court routinely determines on interlocutory appeals from the denial of qualified immunity. *See, e.g., Surat*, 52 F.4th at 1280; *Heard v. Dulayev*, 29 F.4th 1195, 1207 (10th Cir. 2022).

In addition, the existence of some material issues of fact (*see* App. at 529) does not deprive this Court of jurisdiction. This Court "has jurisdiction to review denials of summary judgment based on a finding of material issues of fact by taking as true the facts the district court 'concluded a reasonable jury could find … in favor of the plaintiff' to consider 'abstract questions of law.'" *Surat*, 52 F.4th at 1270 (citation omitted; ellipses in original). *See also Est. of Valverde*, 967 F.3d at 1059 (despite the existence of disputed facts, the Tenth Circuit had jurisdiction over an appeal of the denial of qualified immunity on summary judgment). Because the Officers' appeals raise abstract issues of law under the facts that the District Court concluded a reasonable jury could find, this Court has jurisdiction over the Officers' appeals.

**Pendent Appellate Jurisdiction Over the City's Appeal**

The Court also may exercise pendent appellate jurisdiction over the City of Colorado Springs's ("City") appeal of the denial of its motion for summary judgment

because the City's appeal is " 'inextricably intertwined' " with the Officers' appeals. *Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995), quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995). "[A] pendent appellate claim can be regarded as inextricably intertwined with a properly reviewable claim on collateral appeal … if the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal—that is, when the appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well." *Moore,* 57 F.3d at 930 (emphasis in original).

A municipality's appeal of the denial of summary judgment on a claim under 42 U.S.C. § 1983 is "inextricably intertwined" with an individual defendant's appeal of the denial of qualified immunity on the constitutional violation prong, because a finding that the individual did not violate the plaintiff's constitutional rights necessarily resolves the claim against the municipality. In such cases, this Court tends to exercise pendent appellate jurisdiction over the municipal claim. *See Crowson*, 983 F.3d at 1192 (on appeal of denial of qualified immunity, exercising pendent appellate jurisdiction over county's appeal concerning municipal liability failure to train claim and reversing denial of summary judgment to county, because individual defendant did not violate the plaintiff's constitutional rights); *Moore*, 57 F.3d at 930 (same).

As discussed above, the Officers appeal the denial of qualified immunity based on the constitutional violation prong of qualified immunity. If their appeals on that issue is successful, then the Court's holding necessarily would resolve Plaintiff's claim against the City. Thus, the City's appeal is inextricably intertwined with the Officers' reviewable claims, and this Court can exercise pendent appellate jurisdiction over the City's appeal.

**<u>Timeliness of Appeal</u>**

Defendants' appeals are timely pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A). The District Court entered the order denying the Defendants' motions for summary judgment on March 8, 2023. (App. at 538) Defendants filed their notice of appeal on March 13, 2023. (App. at 539)

## <u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

1.     According to the District Court, Colorado Springs Police Officers Daniel Patterson and Joshua Archer were entitled to "use *some force* … to subdue and detain Mr. Melvin." (App. at 527-28 (emphasis in original)) But did the District Court err when finding that a reasonable jury could conclude that the Officers used excessive force in violation of the Fourth Amendment, where (a) the evidence does not show, and the District Court did not find, that Melvin was subdued or under their control at any time they used force on him, and (b) the Officers' uses of force— namely, physical control techniques, displaying and threatening use of OC spray, an OC spray deployment, up to eight Taser deployments, and two elbow strikes over seven minutes—still did not enable the Officers to subdue and handcuff the actively resisting and evading Jeffrey Melvin?

2.     Did the District Court err when finding that it was clearly established on April 26, 2018, that "deploying a Taser 8 times in approximately 90 seconds, under the circumstances of this case, was violative of the Fourth Amendment" (App. at 532)?

3.     Did the District Court err when denying summary judgment to the City of Colorado Springs where Melvin's constitutional rights were not violated?

## **STATEMENT OF THE CASE**

This case presents the time-worn dilemma police officers face when a non-violent misdemeanant defies their commands to "turn around and put your hands behind your back." To what lengths may the officer go to detain the person? This Court already has answered that question: "officers may employ the amount of force necessary to complete the arrest." *Youbyoung Park v. Gaitan*, 680 Fed. App'x 724, 739 (10th Cir. 2017).

Here, that is all that Colorado Springs Police Officers Daniel Patterson and Joshua Archer did. In their seven-minute struggle to handcuff Jeffrey Melvin, the Officers steadily increased their displays and uses of force on Melvin, so as not to use greater force than what was reasonably necessary to detain him. But physical control techniques, OC spray, Taser deployments, and elbow strikes still did not enable the two Officers to handcuff Melvin. Only when two additional police officers, who were not fatigued by the prolonged fight, arrived on scene were they—that is, the fresh officers, not Officers Patterson and Archer—able to get Melvin into handcuffs. Ultimately, the force that was necessary to handcuff Melvin was the addition of two fresh officers; the force Officers Patterson and Archer used was insufficient to achieve his detention. The District Court therefore erred in concluding that a reasonable jury could find that Officers Patterson and Archer used excessive force on Melvin in violation of his clearly established rights because, as a matter of

law, they did not use force on him when he was subdued or under their control and they did not use *greater* force than reasonably necessary to detain him.

## Facts[1]

On April 26, 2018, at approximately 12:31 a.m., Colorado Springs Police Officers Daniel Patterson and Joshua Archer (the "Officers") "responded to a report of a disturbance in an apartment building." (App. at 507) "The alleged disturbance was a 'cold' disturbance, meaning that it had already occurred and was not ongoing." (*Id.*) "Dispatch informed the Officers that people were fighting in an apartment below the reporting party, no known weapons were involved, and the description of the suspect was unknown." (*Id.*)

"When the Officers arrived at the building, Mr. Melvin was walking out and let the Officers into the apartment complex." (App. at 507) "The Officers did not know who Mr. Melvin was at the time." (*Id.*) "The Officers knocked on the door of apartment 211 and spoke with its occupant, Jordan Bruno." (*Id.*) "When Mr. Bruno opened the door, he was holding a liquor bottle and stated that he had been drinking." (*Id.*) "Mr. Bruno told the Officers that he had a 'physical fight' with his 'homeboys,' but he 'kicked them both out' and they left." (*Id.*) "The Officers asked if anyone was

---

[1] The recitation of facts largely is taken from the District Court's order on the Defendants' motions for summary judgment (App. at 507-513), particularly because this Court must accept as true " 'the facts that the district court ruled a reasonable jury could find.' " *Surat*, 52 F.4th at 1269 (citation omitted).

injured, and Mr. Bruno responded no and said that he was just with his 'two homegirls' in the apartment." (*Id.*)

"Mr. Bruno was cooperative and allowed the Officers to come into his apartment." (App. at 508) "He provided the Officers with his ID." (*Id.*) "In the living room of the apartment, a female juvenile ('A.S.') was sitting on the floor and an adult female, Nancy Dorado, was sitting on the sofa with the TV on." (*Id.*) A.S. was "wearing sweatpants, a tank top, and a blanket wrapped around her shoulders." (App. at 509) "Officer Patterson asked if anyone was hurt and if the two females were okay, and both of them responded that they were fine." (App. at 508) "Neither A.S. nor Dorado displayed signs of distress." (*Id.*) "A.S. told the Officers that she was 16 years old, that her legal guardian, who was her grandmother, resided in Texas, and that her father and uncle lived in Colorado Springs." (*Id.*) Mr. Bruno was nearly 27 years old; Ms. Dorado was 34. (App. at 70 ¶ 7, 272 ¶ 7)

"The Officers spent approximately the next 16 minutes speaking with Mr. Bruno, A.S., and Ms. Dorado." (App. at 509) "[D]uring this time, 'everyone had been pretty cooperative and things were pretty calm.' " (*Id.* (citation omitted)) "Officer Patterson explained to the three occupants of the apartment that he was asking questions and needed to get in contact with A.S.'s parents because it was about 1:00 a.m. and she was 16 years old in an apartment with two adults." (*Id.*) "Mr. Bruno explained that he knew A.S. through a friend from high school." (*Id.*)

9

"A.S. provided a phone number for her father, but no one answered when Officer Patterson called the number." (*Id.*)

"Officer Patterson then asked A.S. to come talk with him in the hallway." (App. at 509) "A.S. stated that she was living with Ms. Dorado at the time, denied being a runaway, and said she would call her uncle who also lives in Colorado Springs." (*Id.*) A.S. also told Officer Patterson that it was just one male who fought with Mr. Bruno earlier. (App. at 69, ¶ 4; App. at 271) "A.S. then returned inside the apartment and told Officer Archer that she got in touch with her uncle, who said that he would come pick her up but it would take about 15 minutes." (App. at 509) "A.S. also asked Officer Archer if she could 'smoke a bowl' of marijuana." (*Id.*)

"While Officer Patterson was out in the hallway on a phone call, he saw Mr. Melvin at the exterior door of the apartment building." (App. at 509) "Officer Patterson opened the door for him and asked Mr. Melvin if he was going to apartment 211." (*Id.* at 509-510) "Mr. Melvin said no, then 'immediately ran' to apartment 211, opened the door, entered the apartment, 'slammed the door shut,' and locked it."[2] (*Id.* at 510) "Officer Patterson, from the hallway, screamed 'Josh' to alert Officer Archer, who was still inside the apartment." (*Id.*)

---

[2] Plaintiff disputes Officer Patterson's characterization of these events only on the basis that there is no video recording showing them. (App. at 510 n.2)

"Officer Archer immediately ordered Mr. Melvin away from the door, and Mr. Melvin complied, expressing surprise and asking, 'Who's Josh?' " (App. at 510) "Mr. Melvin moved away, and Mr. Bruno assisted in unlocking the door." (*Id.*) "[A]pproximately 5-10 seconds passed before Mr. Melvin moved away from the door," and "the door was unlocked and Officer Patterson was able to re-enter the apartment" within 20 seconds. (*Id.*)

"Officer Patterson re-entered the apartment and immediately ordered Mr. Melvin to turn around and put his hands behind his back." (App. at 510) "Mr. Melvin responded, 'No,' pulled his arms away, and moved deeper into the apartment." (App. at 79 ¶ 2; App. at 275) "The Officers began yelling and grabbing for Mr. Melvin." (App. at 510) "The scene quickly became chaotic." (*Id.*) "Officer Patterson grabbed Mr. Melvin's arm and chest and pointed his OC canister (pepper spray) at Mr. Melvin," stating "You're about to get OC'd. Turn around and put your hands behind your back. Now!" (App. at 511; Archer BWC at 18:54[3])

---

[3] The parties conventionally filed the body-worn camera video recordings of Officers Patterson, Archer, Evenson and Gonzalez with the District Court. (*See* App. at 261-263, 391, 420) Pursuant to this Court's order on June 7, 2023, Defendants will submit the body-worn camera video recordings to this Court on a thumb drive. Defendants' citation herein to "Archer BWC" is to the file on the thumb drive labeled "Doc. 123-1 Archer BWC" which was submitted to the District Court as Exhibit 1 to the Individual Defendants' Motion for Summary Judgment (Doc. 123). (*See* App. at 261)

"The Officers struggled with Mr. Melvin" for "over a minute, during which time at least one Officer and at times both of them had hands on Mr. Melvin." (App. at 511) Mr. Melvin did not attempt "to hit, kick, bite, or spit at the Officers;" and he did not threaten anyone. (*Id.*) But "Mr. Melvin held on to the windowsill while resisting and attempted to put his foot up near the windowsill." (*Id.*) "Mr. Melvin also repeatedly yelled for Mr. Bruno to 'help' him." (*Id.*) "Officer Patterson used his OC spray on Mr. Bruno after Mr. Bruno reportedly jogged in place and balled his fists, which Officer Patterson 'interpreted as pre-attack indicators.'" (*Id.*)

"After struggling with Mr. Melvin" for over a minute, "Officer Patterson ordered Officer Archer to tase Mr. Melvin." (App. at 511) "Officer Archer deployed a Taser cartridge at Mr. Melvin for a 5-second Taser cycle while Officer Patterson was holding him, and Mr. Melvin made a sound of pain." (*Id.*) Four seconds after the end of the Taser cycle, "Officer Archer deployed a second Taser cartridge at Mr. Melvin" for a 5-second cycle. (App. at 511-512; App. at 409, lines 627-628)

"Mr. Melvin cried out in pain," and yelled to Mr. Bruno for "help." (App. at 512) When the Taser cycle completed, he said to the Officers, "Okay, I'm stopping. I'm stopping. But let me go. I got asthma." (Archer BWC at 20:08-20:14) While continuing to issue commands to Melvin to "Get on the ground!" and grapple with him, Officer Patterson yelled to the others in the apartment to go open the apartment door for the police officers who would be coming to help, to which Mr. Melvin

responded, "No, don't open no fucking door." (Archer BWC at 20:36-20:41) "20 seconds later, while Officer Patterson was holding Mr. Melvin's arms behind his back," Officer Archer pulled the trigger of his Taser a third time, "sending 5 seconds of charge through the already connected probes." (App. at 512; App. at 409, lines 628-629) "Mr. Melvin again reacted in pain." (App. at 512) "12 seconds later, while Officer Patterson was holding Mr. Melvin's hands behind his back with one arm and had his second arm around the front of Mr. Melvin's neck, Officer Archer deployed his Taser for a fourth 5-second cycle." (*Id.*) "11 seconds later," Officer Archer pulled the trigger of his Taser "a fifth time while Officer Patterson continued to hold him and struggle with [Mr. Melvin] on the ground." (*Id.*; App. at 409, lines 630-631)

During Officer Archer's Taser deployments and the intervals in between, Melvin was "us[ing] his body movements to resist being handcuffed." (App. at 528)

After another approximately 15 seconds of struggling, "Officer Patterson pushed Mr. Melvin away from him and deployed OC spray into Mr. Melvin's face." (App. at 512) "Mr. Melvin attempted to flee and ran towards the entryway of the apartment." (*Id.*) "Officer Patterson deployed his first Taser cartridge at Mr. Melvin." (*Id.*) He perceived that it missed Melvin entirely. (App. at 91:3-92:9 (Patterson Dep.)) He "then immediately deployed his second Taser cartridge one second later." (App. at 512) Officer Patterson's Taser deployment "forced Mr. Melvin to the ground and incapacitated him for 5 seconds." (App. at 512)

13

"Mr. Melvin then stood up, batted the Taser wires away from him, and ran from the apartment." (App. at 512) "The Officers chased Mr. Melvin outside and down the street, where he collapsed about 35 seconds later." (*Id.*) "During the time that he was being held down by the Officers, Mr. Melvin said things like, 'You're killing me. You're honestly killing me'; 'I can't breathe'; 'You've gotta get off. You've gotta get off'; and 'I've honestly got asthma.'" (*Id.*) But "Mr. Melvin lay with an arm underneath his body." (*Id.* at 512-13) Officer Patterson ordered Mr. Melvin, "Get on the ground now!" "Put your hands behind your back!" "Give me your hand!" (Archer BWC at 23:30-23:50) "Officer Patterson struck Mr. Melvin in the abdomen area twice with his elbow to force him to put his hands behind his back." (App. at 513)

Additional Colorado Springs police officers—including Officers Blake Evenson and Richard Gonzalez—arrived on scene while Mr. Melvin lay on the ground with an arm underneath his body. (App. at 80 ¶ 9; App. at 276 ¶ 9) For over a minute, officers commanded Mr. Melvin, "Put your hands behind your back!" "Give me you other hand, man!" "Stop resisting! "You gotta keep your hands behind your back, man!" (Archer BWC at 23:38-25:07) Officer Evenson ultimately was able to pull Mr. Melvin's arm behind his back, and Officer Gonzalez applied the handcuffs. (App. at 276 ¶ 9) All force on Mr. Melvin ceased once he was handcuffed,

approximately seven minutes after he entered the apartment. (App. at 75 ¶ 8; App. at 274 ¶ 8; Archer BWC at 17:58-25:07)

## Procedural History

Plaintiff filed suit against Officer Patterson, Officer Archer and the City on April 8, 2020. (App. at 4) Plaintiff subsequently filed an Amended Complaint on July 1, 2020, asserting a single claim for relief against all Defendants: excessive force under the Fourth Amendment. (App. at 35)

### Summary Judgment Briefing

Officers Patterson and Archer moved for summary judgment based on qualified immunity. (App. at 66) Addressing the crimes at issue, the Officers argued that they had probable cause to believe that Melvin had committed obstructing a peace officer in their presence. (App. at 67) They also argued that they had reasonable suspicion to detain Melvin for far more serious crimes. In relation to the physical fight that had occurred in the apartment, the Officers reasonably suspected Melvin of felony burglary, felony trespass, assault, and harassment, because Melvin could be the assailant returning to the scene of the fight to exact further harm on Bruno. (App. at 68-69) In relation to the juvenile, the Officers reasonably suspected Melvin of felonies relating to human trafficking for sexual servitude and contributing to the delinquency of a minor. (App. at 69-71) Furthermore, Melvin's manner of entry into the apartment—namely, without first obtaining Bruno's

consent—gave them reasonable suspicion for felony burglary and felony trespass. (App. at 71-72)

The Officers also argued that Melvin posed an immediate threat to the safety of himself and others. (App. at 77-78) From the Officers' perspective, Melvin twice had tried to jump head-first out of the apartment's second story window. He failed to comply with the dozens of commands issued by the Officers. He invited Bruno to the fight with the Officers. He appeared to be on drugs. The Officers were fatiguing, but Melvin was not. Melvin hadn't been searched for weapons, and Officer Patterson feared that Melvin would overpower them and gain control of a weapon to harm them or others. (*Id.*)

The evidence also demonstrated that Melvin actively resisted and evaded arrest. (App. at 79-80) Before the Officers used any physical force on Melvin, Officer Patterson ordered him to turn around and put his hands behind his back because he was being detained. Melvin said, "No!" and pulled his arms away from the Officers, walking deeper into the apartment. He actively resisted the Officers' attempts to handcuff him and failed to comply with dozens of commands to stop resisting, lay down on the ground, and to give up his hands. After the only Taser deployment that caused five seconds of incapacitation, Melvin jumped up, swatted the Taser wires away, and took off running. Even after the foot chase, Melvin held

one arm underneath his body, refusing to surrender it for handcuffing. Two fresh, unfatigued officers had to pull Melvin's arm out to finally get him in handcuffs. (*Id.*)

Finally, the Officers argued that their uses of force did not violate clearly established law because they reasonably suspected Melvin of serious felonies, warned him before deploying their Tasers, and ceased all force on him once he was handcuffed. (App. at 81-82) In addition, Melvin actively resisted and attempted to evade detention the entire time, except for the one, five-second Taser cycle that caused neuromuscular incapacitation (NMI). (*Id.*)

Plaintiff filed a response to the Officers' motion (App. at 269-293), and the Officers filed a reply (App. at 442-456).

The City also moved for summary judgment, arguing, *inter alia*, that Plaintiff's failure to demonstrate that the Officers violated Melvin's constitutional rights disposed of Plaintiff's claim against the City. (App. at 423) Plaintiff filed a response (App. at 473-494), and the City filed a reply (App. at 495-505)

**The District Court Order**

The District Court denied both the Officers' and the City's motions for summary judgment. (App. at 538) With respect to the constitutional violation prong of qualified immunity, the District Court analyzed the three *Graham* factors. First, on the "severity of the crime" factor, the District Court found it "implausible" for the Officers to suspect Melvin of any crimes involving A.S., involving the physical

fight that had occurred earlier in the evening between Bruno and one of his "homeboys," and involving Melvin's entry into the apartment without Bruno's permission. (App. at 522-525) The District Court also was "skeptical that it was reasonable to suspect Mr. Melvin of obstruction or interference when he 'ran' from Officer Patterson and locked the door to apartment 211, particularly because (1) there is no evidence that Mr. Melvin was aware that Officer Archer was inside the apartment at the time, and (2) the evidence is disputed whether Mr. Melvin had any reason to believe that apartment 211 was involved in an investigation such that 'locking' Officer Patterson out would obstruct or interfere with Officer Patterson's work as a peace officer."[4] (App. at 525) The District Court also reasoned that "[a]ny 'obstruction'" by Melvin was "temporary and quickly remedied" by Melvin's compliance with Officer Archer's order to move off the door. (App. at 525-26) At most, the District Court concluded, the Officers reasonably suspected Melvin of "obstructing a peace officer," which "is only a class 2 misdemeanor." (App. at 526)

Second, the District Court found that "[t]here is no evidence showing that Mr. Melvin posed an immediate threat to the safety of himself or others before the

---

[4] The District Court deemed the evidence concerning Officer Patterson's interaction with Mr. Melvin in the hallway—where Officer Patterson asked Melvin if he was going to apartment 211—"disputed" solely based on the absence of a video recording of the interaction. (App. at 510 n.2) There is no evidence undermining Officer Patterson's sworn testimony as to the events, however. (App. at 124:17-129:15 (Patterson Dep.))

Officers attempted to detain him." (App. at 526) "He did not issue any verbal or physical threats, the Officers did not observe him carrying any weapons, and he was not physically aggressive towards anyone." (*Id.*)

Third, on "whether Mr. Melvin resisted arrest or attempted to flee," the District Court found that the factor "weighs in favor of the use of some force during the period in which Mr. Melvin was resisting." (App. at 527) With respect to that level force, the District Court identified the " 'relevant inquiry' " as " 'whether the taser use was reasonable and proportionate given [Mr. Melvin's] resistance.' " (*Id.* (citation omitted)) Quoting this Court, the District Court explained, " '[T]he excessive force inquiry evaluates the use of force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case.' " (App. at 527 (citation omitted))

Analyzing the evidence, the District Court noted that "when Officer Patterson re-entered the apartment, he ordered Mr. Melvin to turn around and put his hands behind his back." (App. at 527) Mr. Melvin failed to comply with the order, so "the Officers began grabbing at Mr. Melvin's arms and jacket and struggling with him deeper into the apartment." (*Id.*) "[D]uring approximately the next minute, Mr. Melvin resisted arrest, struggled with the Officers, and failed to comply with repeated commands to stop, to get down, and to put his hands behind his back." (*Id.*)

Thus, according to the District Court, "the use of *some force* was reasonable to subdue and detain Mr. Melvin." (*Id.* at 527-28 (emphasis in original))

But the District Court determined that Mr. Melvin's resistance did not "justify the severe force ultimately used." (*Id.* at 528) The District Court characterized Mr. Melvin's resistance as "not aggressive or violent toward the Officers or anyone else in the apartment." (*Id.*) "Mr. Melvin did not initiate any physical contact; he never attempted to hit, kick, bite, or spit at the Officers; and he never threatened anyone." (*Id.*) According to the District Court, "he merely used his body movements to resist being handcuffed and attempted to flee from the Officers." (*Id.*)

As a result, the District Court found that the Officers' "repeated Taser deployments over the next 90 seconds—several of which occurred within mere seconds of each other, allowing little time for Mr. Melvin to recover and comply with orders—were not justified by the totality of the circumstances based on the undisputed facts." (App. at 529) The District Court concluded that "[a] reasonable jury could determine that the Officers' repeated Taser deployments in quick succession against a resisting but non-violent arrestee were violative of Mr. Melvin's rights under the Fourth Amendment," and "that the Officers unreasonably and immediately escalated the situation at several critical junctures, thus creating the need to use force and causing Mr. Melvin to instinctively attempt to flee from repeated Taser shocks." (*Id.*) In conclusion, the District Court found "a triable issue

20

as to whether [the Officers] violated Mr. Melvin's rights under the Fourth Amendment." (App. at 530)

On the clearly established prong of qualified immunity, the District Court held that "a reasonable officer would have understood that deploying a Taser 8 times in approximately 90 seconds at Mr. Melvin, under the circumstances of this case, was violative of the Fourth Amendment." (App. at 532) To reach its conclusion, the District Court relied on this Court's decisions in *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007), *Cavanaugh v. Woods Cross City*, 625 F.3d 661 (10th Cir. 2010), and *Perea v. Baca*, 817 F.3d 1198 (10th Cir. 2016). (App. at 531-532) The District Court expressed its belief that these three cases "have clearly established that disproportionate use of a Taser on a nonviolent arrestee not suspected of a serious crime constitutes excessive force." (App. at 532) Even though the District Court explicitly acknowledged that "there is no specific limit on the number of times an arrestee may be tased within a given time interval," it nonetheless concluded that the unconstitutionality of "deploying a Taser 8 times in approximately 90 seconds" was " 'beyond debate.' " (App. at 530, 532 (citation omitted))

Finally, the District Court denied the City's motion for summary judgment, in part "[b]ecause [it] found a triable issue as to whether the Officers exceeded constitutional limitations on the use of force." (App. at 534)

21

## SUMMARY OF THE ARGUMENT

**I.     Constitutional Violation Prong:** The District Court erred in finding

that the Officers' "repeated Taser deployments … were not justified by the totality

of the circumstances" (App. at 529) for two reasons. First, the evidence does not

show, and the District Court did not find, that Melvin was subdued or under the

Officers' control at any time when they deployed their Tasers. Second, *none* of the

Officers' uses of force enabled them to detain Melvin. Thus, as a matter of law, the

Officers could not have " 'used greater force than would have been reasonably

necessary to effect a lawful arrest.' " *Youbyoung Park v. Gaitan*, 680 Fed. App'x

724, 738 (10th Cir. 2017) (citation omitted).

**II.     Clearly Established Prong:** The District Court erred when it

concluded that it was clearly established as of April 26, 2018 "that deploying a Taser

8 times in approximately 90 seconds at Mr. Melvin, under the circumstances of this

case, was violative of the Fourth Amendment." (App. at 532) First, neither Officer

deployed their Taser eight times, so the District Court's analysis was flawed from

the start. Second, despite acknowledging that this Court explicitly has "declined to

'set a specific limit on the number of times an arrestee may be tased within a given

time interval,'" the District Court nonetheless held that the unconstitutionality of

"the *multiple, repeated*" Taser deployments here was " 'beyond debate.' " (App. at

530, 532 n.6 (citation omitted; emphasis in original))  No such precedent clearly

established the right. Third, the District Court erroneously relied on the flawed and far too general principle that "disproportionate use of a Taser on a nonviolent arrestee not suspected of a serious crime constitutes excessive force" to deprive the Officers of qualified immunity. (App. at 532)

**III.    Municipal Liability:** Because the Officers did not violate Melvin's constitutional rights, the District Court erred in denying the City's motion for summary judgment.

## ARGUMENT

**I.    The District Court Erred When Finding That A Reasonable Jury Could Conclude That The Officers Violated Melvin's Constitutional Rights.**

*Standard Of Review.* This Court reviews " 'the district court's denial of summary judgment on qualified immunity grounds de novo.' " *Surat*, 52 F.4th at 1270 (citations omitted).

### A.    The Officers are entitled to qualified immunity because they did not use excessive force on Melvin.

The doctrine of qualified immunity protects public officials, including police officers, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *See also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "[W]hen a defendant advances a qualified-immunity defense, this 'trigger[s] a well-settled twofold burden' that the

23

plaintiff must bear. That burden requires 'the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established.'" *Clark v. Bowcutt*, 675 Fed. App'x 799, 805 (10th Cir. 2017) (internal citations omitted). "This is a heavy burden. If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).

On the first prong, the issue is whether the official's actions, as evidenced by the summary judgment record, violated the plaintiff's constitutional rights. *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). " 'When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures.' " *Surat*, 52 F.4th at 1271 (citation omitted). Determining the reasonableness of a seizure requires analyzing the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The Court is to conduct this analysis "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and this "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are

tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

Accordingly, a measure of deference is due an officer's use of force. *See Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (reiterating that "judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation"); *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005) ("What may later appear to be unnecessary when reviewed from the comfort of a judge's chambers may nonetheless be reasonable under the circumstances presented to the officer at the time"); *Davenport v. Causey*, 521 F.3d 544, 552 (6th Cir. 2008) (a court is "required to provide a measure of deference to the officer's on-the-spot judgment about the level of force necessary").

Here, the facts that the District Court ruled a reasonable jury could find do not suffice to show a violation of Melvin's constitutional rights.

**B.      Multiple, repeated Taser deployments on an individual who, like Melvin, is not subdued or under the Officers' control are objectively reasonable.**

This Court already has found that an officer's repeated use of a Taser on a resisting individual, such as Melvin, who is not subdued or under the officer's control is objectively reasonable. *See Edwards v. City of Muskogee, Okla.*, 841 Fed. App'x 79, 85 (10th Cir.), *cert. denied sub nom. Edwards v. Harmon*, 142 S. Ct. 98

(2021); *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 781 (10th Cir. 1993). *Cf.*
*Perea v. Baca*, 817 F.3d 1198, 1203-04 (10th Cir. 2016).

In *Edwards*, two officers sought to handcuff a driver who they suspected to
be under the influence of PCP. 841 Fed. App'x at 80. "[B]oth officers had trouble
handcuffing [plaintiff], as he did not keep his arms behind him." *Id.* The officers
forced the plaintiff to the ground, but they " 'could not control [the plaintiff's] hands
and arms,' as '[h]e was extremely strong.' " *Id.* at 81. The officers tased the plaintiff
multiple times, but the taser appeared to have no effect. *Id.* "Indeed, [the plaintiff]
attempted to stand up while continuing to struggle with both officers" after being
tased. *Id.* at 81, 85. Over almost four minutes, "officers employed considerable force
against [the plaintiff]." *Id.* at 80, 84. Additional officers arrived and only with their
assistance were the officers able to handcuff the plaintiff. *Id.* at 82. This Court
affirmed summary judgment for the officers on plaintiff's excessive force claim,
finding "the absence of a constitutional violation." *Id.* at 85.

In *Hinton*, this Court likewise affirmed summary judgment for police officers
who used a taser "numerous" times on an actively resisting individual. 997 F.2d at
781. In *Hinton*, officers were investigating a misdemeanor, and the suspect was not
a threat to the officers or to the public, was not armed, was not under the influence
of drugs, was outnumbered by the officers, and was in the company of five children.
*Id.* But the suspect refused to talk to the police and shoved one of the officers. *Id.*

The officers' "use of force was preceded by an announcement that [plaintiff] was under arrest and [at first] consisted only of [an officer] grabbing [plaintiff] to keep him from leaving." *Id.* "After grabbing [the plaintiff], [the officers] increased their application of force. Not only did they wrestle him to the ground but they used a stun gun on him," "numerous" times. *Id.* Although the first two *Graham* factors weighed against the officers' use of force, in light of the suspect's active resistance to the officers' attempts to handcuff him, this Court found no constitutional violation. *Id. See also Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) ("If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him.").

In *Perea v. Baca*, 817 F.3d 1198 (10th Cir. 2016), by contrast, this Court held that officers who continued to taser the plaintiff "after he was effectively subdued and brought under the officers' control" used excessive force. 817 F.3d at 1204. The plaintiff "was tackled to the ground for—at most—a traffic infraction," and he "posed no threat to the officers or others until the officers initiated the arrest." *Id.* Although the officers tased the plaintiff ten times in two minutes, this Court did not hold that *all* their Taser deployments were excessive. *Id.* at 1204. Tasings that occurred "during the period in which [the plaintiff] was resisting" were reasonable. *Id.* at 1203. It was only "[t]he repeated use of the taser against a *subdued* offender" that was "unreasonable." *Id.* at 1204 (emphasis added).

27

According to the precedent of this Court, then, the critical inquiry is not the number times an officer deploys their Taser or the amount of time between deployments. Indeed, this Court explicitly has "not set a specific limit on the number of times an arrestee may be tased within a given time interval."[5] *Perea*, 817 F.3d at 1205 n.4. Rather, the critical inquiry is whether—at the time that the officer deploys their Taser—the subject "is actively resisting arrest or attempting to evade arrest by flight" or he is "subdued." *Graham*, 490 U.S. at 396; *Perea*, 817 F.3d at 1203-04. Even if the first two *Graham* factors weigh in the plaintiff's favor, the third *Graham* factor—"whether he is actively resisting arrest or attempting to evade arrest by flight," *i.e.,* not subdued—can outweigh the other two and justify repeated Taser deployments to detain an individual. *See Hinton*, 997 F.2d at 781; *Perea*, 817 F.3d at 1203-04.

Here, the facts of this case concerning Melvin's resistance are eerily similar to those in *Edwards* and *Hinton*. As in *Edwards*, "both [O]fficers had trouble handcuffing [Melvin], as he did not keep his arms behind him." 841 Fed. App'x at

---

[5] This Court was wise to decline to "set a specific limit on the number of times an arrestee may be tased within a given time interval." *Perea*, 817 F.3d at 1205 n.4. Many policy reasons weigh against the adoption of hard limits on the use of any force tool, including the Taser. As just one example, future arrestees would know that if they simply could withstand the pre-ordained threshold, they ultimately may be able to overpower the officer, harm the officer or others, and elude arrest. This Court should, again, decline to adopt a limit on the number of times an arrestee may be tased within a given timeframe.

80. (Archer BWC at 18:21-19:45) The Officers forced Melvin to the ground, but they " 'could not control [Melvin's] hands and arms." 841 Fed. App'x at 81. (Archer BWC at 19:17-21:05) The Officers deployed their Tasers at Melvin multiple times, but the Taser deployments did not cause Melvin to stop resisting or enable the Officers to handcuff him. 841 Fed. App'x at 81. (Archer BWC at 19:47-21:35) After being tased, Melvin "attempted to stand up while continuing to struggle with both officers," running for the apartment's entryway. 841 Fed. App'x at 81, 85. (Archer BWC at 19:47-22:08) Additional officers arrived and only with their assistance were officers able to handcuff Melvin. 841 Fed. App'x at 82. (Archer BWC at 24:29-25:07)

Similarly, as in *Hinton*, before using any physical force on Melvin, the Officers first ordered him to put his hands behind his back because he was being detained. 997 F.2d at 781. (Archer BWC at 18:17-18:25) When Melvin failed to comply, they "grabb[ed] for Mr. Melvin." (App. at 510, citing Archer BWC at 18:25-18:52) *See Hinton*, 997 F.2d at 781. "After grabbing [Melvin], [the Officers] increased their application of force. Not only did they wrestle him to the ground but they used a stun gun on him," "numerous" times. *Id.* (Archer BWC at 18:52-21:35) "However," Melvin "was actively and openly resisting [the Officers'] attempts to handcuff him." 997 F.2d at 781. (App. at 511, 513, 527-530) Finally, the Officers

"ceased using the [Taser]"—indeed, ceased using all force—when other officers "had succeeded in handcuffing him." 997 F.2d at 781. (App. at 75 ¶ 8; 274 ¶ 8; 513)

Despite the close factual similarity of this case to *Edwards* and *Hinton*, the District Court failed to follow this Court's on-point precedent. In fact, the District Court did not even *address* this Court's decisions in *Edwards* and *Hinton*, in spite of the Officers' thorough discussion of them in their motion for summary judgment. (App. at 75-76)

Instead, the District Court relied on *Perea* to find that the Officers' "repeated Taser deployments … were not justified." (App. at 528-29) But the District Court misconstrued *Perea*. In *Perea*, this Court did not hold that "resistance of 'thrashing and swinging a crucifix' did not justify the 'severe response' of being tased 10 times in two minutes." (App. at 528) As discussed above, it was the officers' "continued tasering … *after* [the plaintiff] was effectively subdued and brought under the officers' control" that was excessive. 817 F.3d at 1204 (emphasis added). The officers' "justification" for tasing the plaintiff in *Perea* "disappeared" only "when [the plaintiff] was under the officers' control," not any sooner. *Id.* at 1204.

In this case, unlike in *Perea*, the District Court did *not* conclude that a reasonable jury could find that Melvin was subdued or under the Officers' control when they used force on him. (App. at 528-29) In fact, the District Court acknowledged Melvin's continuous resistance and the Officers' inability to handcuff

him; it merely characterized Melvin's resistance as "not aggressive or violent." (App. at 528) It noted that, at times, Officer Patterson was "holding" Melvin (App. at 511) or "holding Mr. Melvin's hands behind his back with one arm and had his second arm around the front of Melvin's neck" (App. at 512). And for some of the Officers' Taser deployments, the District Court concluded that Melvin had "little time … to recover and comply with orders." (*Id.* at 529)

But *from the Officers' perspective*—indeed, the perspective from which the Court is required to view the facts, *Estate of Valverde*, 967 F.3d at 1062—having their hands on Melvin did not render him subdued or under their control such that he could be handcuffed. Between Officer Archer's Taser deployments, Melvin had 4 seconds, 20 seconds, 12 seconds, and 11 seconds. (App. at 511-512; App. at 409, lines 627-631) During those intervals, Melvin asked Bruno for "help," committed to "stopping" his resistance, told the Officers he had asthma, and yelled, "No, don't open no fucking door" for other officers who would be arriving. (Archer BWC at 19:47-21:11) In addition, as the District Court found, Melvin "used his body movements to resist being handcuffed and attempted to flee from the Officers." (App. at 528) Importantly, the District Court never found that Melvin was subdued or under the Officers' control at *any* time the Officers used force on him, or that a reasonable jury could find as much. The holding of *Perea*, thus, is inapposite.

31

Otherwise, the District court ventured outside the Tenth Circuit to find snippets from cases to support the denial of the Officers' summary judgment motion. (App. at 528-29) The District Court relied on *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010) for the notion that " 'resistance' is not 'a binary state' of 'either completely passive or active." (App. at 528) But in *Bryan*, the plaintiff's "conduct [did] not constitute resistance at all." *Id.* Unlike Melvin, the plaintiff there was visibly "unarmed, stationary … , [and] facing away from an officer at a distance of fifteen to twenty-five feet" when the officer tased him without warning. *Id.* at 827.

The District Court also cited to *Smith v. Ray*, 781 F.3d 95, 104 (4th Cir. 2015) as support for the notion that "the Officers unreasonably and immediately escalated the situation at several critical junctures, thus creating the need to use force and causing Mr. Melvin to instinctively attempt to flee from repeated Taser shocks." (App. at 529) But the facts of *Smith* likewise are materially distinguishable. In *Smith*, before the officer's use of force, the plaintiff "had been fully compliant and responsive to [the officer's] instructions and questions. [She] neither turned her back to [the officer], nor attempted to flee." *Smith*, 781 F.3d at 102. In addition, the officer "grabbed [the plaintiff] without warning or explanation," causing the plaintiff "to instinctively attempt to pull herself from his grasp," and "demand[] that he explain himself." *Id.* at 103. In response, the officer threw the plaintiff down, jammed his leg into her back, and wrenched her arm behind her. *Id.*

32

Here, by contrast, Melvin was not "fully compliant and responsive" to the Officers. Before Melvin entered the apartment, Officer Patterson tried to talk to him in the hallway, simply asking him whether he was going to apartment 211. (App. at 509-510) Rather than take the opportunity to explain his basis for returning to the apartment or to leave, Melvin said, "No," then ran straight into the subject apartment and slammed, locked, and leaned against the door.[6] (*Id.* at 510) Additionally, before the Officers used any physical force on Melvin, they gave him the chance to submit peacefully to detention. (*Id.*) Only once Melvin refused, the Officers steadily increased their displays and uses of force on Melvin—working their way through physical control techniques, displaying and threatening use of OC spray, five Taser deployments, an OC spray deployment, three Taser deployments, and two elbow strikes over nearly seven minutes—in an effort to use only the force necessary to detain him. (App. at 510-513) Melvin had the opportunity to comply with verbal

---

[6] Again, Plaintiff disputes Officer Patterson's characterization of these events only on the basis that there is no video recording of them. (App. at 510 n.2) But Plaintiff submitted no evidence to challenge Officer Patterson's sworn testimony concerning his encounter with Melvin in the hallway. (App. 124:17-129:15 (Patterson Dep.)) The District Court therefore erred when concluding that "the evidence is disputed." (App. at 525) *See Helvie v. Jenkins*, 66 F.4th 1227, 1234-35 (10th Cir. 2023) ("[A]t the summary judgment stage of litigation, the party challenging the credibility of a sworn statement 'must' produce 'specific facts ... in order to put credibility in issue so as to preclude summary judgment. Unsupported allegations that credibility is in issue will not suffice.' " (citation omitted))

commands prior to *any* force being used, but he refused. Thus, the District Court's reliance on *Smith* also is misplaced.

In this case, the District Court did not conclude that a reasonable jury could find, and the evidence does not show, that the Officers used force on Melvin when he was subdued or under their control. The "two fundamentals of the necessary analysis" must be remembered: "First, … allowance needs to be made for the fact that the officer must make a split-second decision…. [And] second, … the facts must be viewed from the perspective of the officer." *Estate of Valverde*, 967 F.3d at 1062. Under this Court's precedent, the Officers' use of force was reasonable.

### C. *None* of the Officers' uses of force enabled them to subdue and detain Melvin.

The District Court found, based on the summary judgment record, that the Officers were entitled to use "*some force* … to subdue and detain Mr. Melvin." (App. at 528) But the District Court concluded that "the repeated Taser deployments over … 90 seconds—several of which occurred within mere seconds of each other, allowing little time for Mr. Melvin to recover and comply with orders—were not justified by the totality of the circumstances based upon the undisputed facts." (*Id.* at 529)

This was error. "In cases of physical resistance to an arrest, as here, officers may employ the amount of force necessary to complete the arrest and—if they believe (even mistakenly) that the arrestee will continue to fight back—they may

34

use 'more force than in fact' necessary." *Youbyoung Park v. Gaitan*, 680 Fed. App'x 724, 739-40 (10th Cir. 2017) (internal citations omitted). The District Court acknowledged this principle (*see* App. at 527) but misapplied it.

The facts, as found by the District Court, show that despite their uses of force, Officers Patterson and Archer themselves were unable to detain him. Thus, as a matter of law, they could not have " 'used greater force than would have been reasonably necessary to effect a lawful arrest' " of Melvin and did not violate his constitutional rights. *Youbyoung Park*, 680 Fed. App'x at 738 (citation omitted).

To begin, before the Officers used *any* physical force on Melvin, Officer Patterson ordered Melvin to turn around and put his hands behind his back because he was being detained. (App. at 510; Archer BWC at 18:21-18:46) Melvin thus had the "chance to submit peacefully to an arrest." *Cf. Casey v. City of Federal Heights*, 509 F.3d 1278, 1282 (10th Cir. 2007). *See also id.* at 1285 (officer who "gave [the plaintiff] no opportunity to comply with her wishes before firing her Taser" used excessive force).

Only once Melvin disobeyed Officer Patterson's command did the Officers grab Melvin's arms in an attempt to detain him. (App. at 510-511) But they couldn't control his hands to get him cuffed, as Melvin pulled away from them. (Archer BWC at 18:21-18:52) After struggling with Melvin deeper into the apartment, Officer Patterson displayed his OC canister, saying "You're about to get OC'd. Turn around

and put your hands behind your back. Now!" (App. at 511; Archer BWC at 18:54) The threat of OC spray didn't cause Melvin to comply either. (*Id.*)

The Officers continued to physically struggle with Melvin for over a minute, utilizing repeated commands and physical control techniques in an attempt to detain him. (App. at 511) They both had hands on him at times, but still couldn't get his hands into handcuffs. (*Id.*) Melvin "resisted arrest, struggled with the Officers, and failed to comply with repeated commands to stop, to get down, and to put his hands behind his back." (App. at 527) After over a minute of physically struggling with Melvin for control and when lesser forms of force failed to cause Melvin to stop resisting and enable the Officers to detain him, Officer Archer deployed his Taser at Melvin. (App. at 511)

None of Officer Archer's Taser deployments enabled the Officers to handcuff Melvin. (App. at 147:20-148:10 (Patterson Dep.), 511-12; Archer BWC at 19:53-20:57) Officer Patterson then sprayed Melvin with OC spray, after which Melvin jumped up and ran toward the entryway of the apartment. (App. at 512) Nor did Officer Patterson's Taser deployments enable the Officers to handcuff Melvin. (*Id.*) He perceived his first Taser deployment to miss Melvin entirely. (App. at 91:3-92:9 (Patterson Dep.)) And after the only Taser deployment that incapacitated Melvin for five seconds in a narrow hallway, Melvin "stood up, batted the Taser wires away from him, and ran from the apartment." (*Id.*)

36

Even when the Officers caught up to Melvin after the foot chase, they were unable to detain him. That is because Melvin "lay with an arm underneath his body." (App. at 512-513) "Officer Patterson struck Mr. Melvin in the abdomen area twice with his elbow to force him to put his hands behind his back." (App. at 513) Those strikes also proved ineffective.

When additional officers arrived on scene, Melvin still was not detained. (App. at 80 ¶ 9; at 276 ¶ 9) For over a minute, officers commanded Melvin, "Put your hands behind your back!" "Give me you other hand, man!" "Stop resisting! "You gotta keep your hands behind your back, man!" (Archer BWC at 23:38-25:07) Melvin eventually was handcuffed, but not by Officer Patterson or Officer Archer. (App. at 276 ¶ 9) Indeed, as Plaintiff concedes, it was two fresh, unfatigued police officers who ultimately accomplished Melvin's handcuffing. (*Id.*) All force on Melvin ceased once Melvin was handcuffed. (App. at 75 ¶ 8; App. at 274 ¶ 8)

Because *none* of the Officers' uses of force on Melvin enabled them to detain him, as a matter of law, they could not be excessive. This Court should reverse the District Court and hold that the Officers did not violate Melvin's constitutional rights.

II.    **The District Court Erred When Finding That It Was Clearly Established On April 26, 2018 That Deploying A Taser Eight Times In Approximately 90 Seconds On An Actively Resisting Subject Who, Over The Course Of 7 Minutes, Defied All Orders To Surrender For Handcuffing Violates the Fourth Amendment.**

*Standard Of Review.* This Court reviews " 'the district court's denial of summary judgment on qualified immunity grounds de novo.' " *Surat*, 52 F.4th at 1270 (citations omitted).

A constitutional violation is clearly established if "the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, -- U.S. --, 138 S. Ct. 577, 589 (2018) (citation and internal quotation marks omitted). Under "[t]his demanding standard," the alleged violation "must have a sufficiently clear foundation in then-existing precedent"—either "controlling authority" from the Supreme Court or Tenth Circuit "or a robust consensus of cases of persuasive authority." *Id.* at 589-90 (citation and internal quotation marks omitted); *Helvie v. Jenkins*, 66 F.4th 1227, 1242 (10th Cir. 2023). The clearly-established-law prong, moreover, "requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Wesby,* 138 S.Ct. at 590. Accordingly, the plaintiff must "identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment." *Id.* (citation and internal quotation marks omitted; ellipses in original). The case need not be "directly on point," but the "existing precedent must

place the lawfulness of the [defendant's conduct] beyond debate." *Id.* at 589, 590 (citation and internal quotation marks omitted). Where the facts of the case at issue differ materially from those of existing precedent, then the law was not clearly established. *See Heard*, 29 F.4th at 1205.

### A.    No Officer deployed his Taser eight times.

In this case, the District Court held "that a reasonable officer would have understood that deploying a Taser 8 times in approximately 90 seconds at Melvin, under the circumstances of this case, was violative of the Fourth Amendment." (App. at 532) But neither Officer Patterson nor Officer Archer deployed their Taser at Melvin eight times. Officer Archer pulled the trigger of his Taser five times. (App. at 409 lines 627-631, 508) He couldn't know that Officer Patterson later would deploy his Taser at Melvin. Officer Patterson pulled the trigger of his Taser just twice and knocked the arc switch once for less than a second. (App. at 403 lines 1805-1807, 400-01, 508) At the time, Officer Patterson believed that Officer Archer only had deployed his Taser twice, each with no effect. (App. at 121:4-14, 147:18-148:10 (Patterson Dep.))

Thus, the District Court's analysis of the clearly established prong was flawed from the start. It erroneously charged both Officers with deploying their Tasers eight times at Melvin when neither did.

**B.     This Court explicitly has not "set a specific limit on the number of times an arrestee may be tased within a given time interval."**

The District Court referenced three of this Court's Taser cases when discussing the clearly established law prong (App. at 531-32), but none put the Officers on notice that their Taser deployments were unconstitutional. In *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007), this Court found that a police officer who tased a misdemeanant "who was neither violent nor attempting to flee" violated his clearly established constitutional rights. 509 F.3d at 1282, 1285-1286. Critical to this Court's reasoning in *Casey* was the fact that the officer "hit [plaintiff] with her Taser 'immediately and without warning;' " she gave the plaintiff "no opportunity to comply with her wishes before firing her taser." 509 F.3d at 1285 (citation omitted). Here, by contrast, Melvin had countless chances to avoid the Taser deployments. Before either Officer put a hand on Melvin, Officer Patterson ordered Melvin to turn around and put his hands behind his back because he was being detained. (App. at 510; Archer BWC at 18:21-18:47) Before a single Taser deployment, "Mr. Melvin resisted arrest, struggled with the Officers, and failed to comply with repeated commands to stop, to get down, and to put his hands behind his back." (App. at 527)

*Cavanaugh v. Woods Cross City*, 625 F.3d 661 (10th Cir. 2010) also is materially distinguishable. In *Cavanaugh*, this Court held that an officer who—"without first giving a warning"—tased a woman suspected of no crime, who did

40

not pose and immediate threat to the officer or anyone else, and who "was neither actively resisting nor fleeing arrest" violated the woman's clearly established rights. 625 F.3d at 665. Again, indispensable to this Court's holding was the officer's failure to give a warning before deploying his Taser. *See id.* at 667. Here, the District Court did not find, and the evidence does not show, that the Officers failed to warn Melvin before deploying their Tasers. (Archer BWC at 19:47, 19:51, 20:02, 21:18) Additionally, Melvin was actively resisting and evading arrest, also unlike the plaintiff in *Cavanaugh*.

*Perea v. Baca*, 817 F.3d 1198, 1203-04 (10th Cir. 2016), on which the District Court principally relied (App. at 531-532), did not establish what the District Court contends it did. The holding of *Perea* was stated by this Court as follows:

> We hold that the officers' repeated tasering of Perea *after he was subdued* constituted excessive force, and that it was clearly established at the time of the taserings that such conduct was unconstitutional.

817 F.3d at 1200 (emphasis added). In *Perea*, this Court did not find that the officers' use of the Taser on the plaintiff "during the period in which [he] was resisting" was unconstitutional. 817 F.3d at 1203. It was the officers' "continued and increased use of force … *after* Perea was effectively subdued and brought under the officers' control" that was excessive. *Id.* at 1203-04 (emphasis added). Critical to the Court's holding in *Perea* was that the plaintiff was subdued when officers continued to use force on him: "no reasonable officer could conclude that continuing to taser a

41

*subdued* detainee is constitutional." *Id.* at 1205 n.4 (emphasis added). But here, Melvin wasn't subdued until he was handcuffed. And there is no contention or evidence that the Officers used force on Melvin after he was handcuffed. Thus, *Perea* simply is inapposite.

Moreover, in *Perea,* this Court specifically did "not set a specific limit on the number of times an arrestee may be tased within a given time interval." 817 F.3d at 1205 n.4. Despite this explicit direction, the District Court nonetheless somehow concluded from *Perea* that it was clearly established that tasing Melvin eight times in 90 seconds—without finding that Melvin was subdued or under the Officers' control at any time during those 90 seconds—constituted excessive force. (App. at 532 & n.6) The District Court erred.

**C.  The principle that the "disproportionate use of a Taser on a nonviolent arrestee not suspected of a serious crime constitutes excessive force" misstates the law and is far too general to apprise the Officers of the unconstitutionality of their Taser deployments.**

The principle that the District Court drew from *Casey*, *Cavanaugh*, and *Perea* is both erroneous and far too general to put the Officers on notice of the unconstitutionality of their conduct. The District Court stated "that the above Tenth Circuit cases have clearly established that disproportionate use of a Taser on a nonviolent arrestee not suspected of a serious crime constitutes excessive force." (App. at 532) But this misstates the law, because it omits the detainee's resistance and evasion from the analysis. As *Perea* explains, disproportionate force is the use

of more force than reasonably necessary to effect an arrest. *See Perea*, 817 F.3d at 1203. Repeated Taser deployments on an actively resisting detainee who is not under the Officers' control is not disproportionate or excessive. *See id.; Edwards*, 841 Fed. App'x at 85; *Hinton*, 997 F.2d at 781. As stated in *Perea*, the "justification" for the Officers' use of force "disappeared" only once the plaintiff "was under the officers' control." 817 F.3d at 1204. Thus, Melvin may have been "a nonviolent arrestee not suspected of a serious crime" (App. at 532), but the Officers' Taser deployments were not "disproportionate"—i.e., were not excessive—because Melvin was not subdued or under their control at any time they used force.

Furthermore, the rule that the District Court drew from *Casey*, *Cavanaugh*, and *Perea* is far too general to apprise every reasonable officer of the unconstitutionality of Officer Patterson's and Officer Archer's conduct in this case. "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.' " *Wesby*, 138 S.Ct. at 590. It is a wonder how the Officers here could be on notice that their Taser use would be "disproportionate" where their Taser deployments—indeed, all their uses of force—did not enable them to detain Melvin.

This Court's precedent in fact demonstrates that Melvin did *not* have a clearly established constitutional right *not* to be tased up to eight times in 90 seconds under the circumstances. *See Heard*, 29 F.4th at 1207; *Coronado v. Olsen*, No. 20-4118,

43

2022 WL 152124, at *5 (10th Cir. Jan. 18, 2022) (unpublished); *Edwards*, 841 Fed. App'x at 85; *Waters v. Coleman*, 632 Fed. App'x 431, 437-38 (10th Cir. 2015); *Wilson v. City of Lafayette*, 510 Fed. App'x 775, 779 (10th Cir. 2013); *Hinton*, 997 F.2d at 781-782. The District Court should be reversed.

### III.    The District Court Erred When Denying Summary Judgment To The City Because Melvin's Constitutional Rights Were Not Violated.

The City moved for summary judgment based on Plaintiff's failure to prove a violation of Melvin's constitutional rights. (App. at 423) The District Court erred in concluding that a reasonable jury could find that the Officers committed a constitutional violation. (*See supra* Part I) Thus, this Court should exercise pendent appellate jurisdiction over the City's appeal and reverse the denial of the City's motion for summary judgment. *See Crowson*, 983 F.3d at 1192; *Moore*, 57 F.3d at 930.

### CONCLUSION

The judgment below denying the Defendants' motions for summary judgment should be reversed and judgment should enter for Daniel Patterson, Joshua Archer, and the City of Colorado Springs.

### STATEMENT REGARDING ORAL ARGUMENT

The facts of this case test this Court's precedent on law enforcement's use of a Taser on an actively resisting and evading nonviolent misdemeanant. Thus,

Defendants-Appellants believe that the decisional process would be significantly aided by oral argument.

Dated June 7, 2023

Respectfully submitted,

OFFICE OF THE CITY ATTORNEY OF
THE CITY OF COLORADO SPRINGS
Wynetta P. Massey, City Attorney

*s/ Anne H. Turner*
Anne H. Turner (Digital)
Assistant City Attorney
P. O. Box 1575, Mail Code 510
30 S. Nevada Ave., Suite 501
Colorado Springs, Colorado 80901-1575
Telephone: (719) 385-5909
Facsimile: (719) 385-5535
anne.turner@coloradosprings.gov

*Attorneys for Defendants-Appellants*

45

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(A) and (B) because it does not exceed 30 pages, and according to the word processing system used to prepare the brief, it contains 10,870 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO (Version 2211 Build 16.0.15831.20280) 64-bit in Times New Roman 14-point type.

Dated this 7th day of June, 2023.

OFFICE OF THE CITY ATTORNEY OF THE
CITY OF COLORADO SPRINGS
Wynetta P. Massey, City Attorney

*s/ Anne H. Turner*
Anne H. Turner, (Digital)
Assistant City Attorney
P. O. Box 1575, Mail Code 510
30 S. Nevada Ave., Suite 501
Colorado Springs, Colorado 80901-1575
Telephone:  (719) 385-5909
Facsimile:  (719) 385-5535
anne.turner@coloradosprings.gov

*Attorneys for Defendants-Appellants*

46

## CERTIFICATE OF DIGITAL SUBMISSION
## AND PRIVACY REDACTIONS

I hereby certify with respect to the foregoing:

1.      All required privacy redactions have been made per 10th Cir. R. 25.5;

2.      The ECF submission is an exact copy of the written document filed with the Clerk; and

3.      The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, CrowdStrike Falcon Platform, sensor version 4.18.8104.0, most recently updated **June 7, 2023**, and according to the program, is free from viruses.

<div style="margin-left:40%">

s/Amy McKimmey

Amy McKimmey
Legal Secretary (Digital)
Office of the City Attorney of the
City of Colorado Springs
30 South Nevada Avenue, Suite 501
Colorado Springs, CO  80903
Telephone:  (719) 385-5909
Facsimile:  (719) 385-5535

</div>

47

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I hereby certify that on the 7th day of June, 2023 I electronically filed the foregoing **APPELLANTS' OPENING BRIEF** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Darold W. Killmer (dkillmer@kln-law.com)
Liana Orshan (lorshan@kln-law.com)
Reid R. Allison (rallison@kln-law.com)

*Attorneys for Plaintiff-Appellee*

<u>*s/Amy McKimmey*</u>
Amy McKimmey
Legal Secretary

48

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello**

Civil Action No. 20-cv-00991-CMA-STV

ESTATE OF JEFFREY MELVIN, by and through its personal representative Jeffrey
Melvin Sr.,

      Plaintiff,

v.

CITY OF COLORADO SPRINGS, COLORADO,
DANIEL PATTERSON, in his individual capacity, and
JOSHUA ARCHER, in his individual capacity,

      Defendants.

---

**ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

---

This matter is before the Court on (1) individual Defendants Daniel Patterson and
Joshua Archer's Motion for Summary Judgment (Doc. # 123); and (2) Defendant City of
Colorado Springs's Motion for Summary Judgment (Doc. # 150). For the following
reasons, the Court denies the Motions.

**I.      BACKGROUND**

This is a 42 U.S.C. § 1983 case arising from the death of Jeffrey Melvin and
brought by his estate ("Plaintiff"). (Doc. # 1.) Unless otherwise indicated, the following
material facts are undisputed.

A.    **EVENTS OF APRIL 26, 2018**

On April 26, 2018, at approximately 12:31 a.m., Colorado Springs Police Officers Archer and Patterson ("Individual Defendants" or the "Officers") responded to a report of a disturbance in an apartment building. (Doc. # 144-1 at 10.)[1] The alleged disturbance was a "cold" disturbance, meaning that it had already occurred and was not ongoing. (*Id.* at 38–39.) Dispatch informed the Officers that people were fighting in an apartment below the reporting party, no known weapons were involved, and the description of the suspect was unknown. (*Id.* at 69.)

When the Officers arrived at the building, Mr. Melvin was walking out and let the Officers into the apartment complex. (Doc. # 123-6 at 5.) The Officers did not know who Mr. Melvin was at the time. (*Id.*) The Officers knocked on the door of apartment 211 and spoke with its occupant, Jordan Bruno. (Doc. # 123-1, Archer BWC at 00:00–01:31.) When Mr. Bruno opened the door, he was holding a liquor bottle and stated that he had been drinking. (*Id.* at 00:06–00:20.) Mr. Bruno told the Officers that he had a "physical fight" with his "homeboys," but he "kicked them both out" and they left. (*Id.* at 00:30–00:43; 01:10–01:32.) The Officers asked if anyone was injured, and Mr. Bruno responded no and said that he was just with his "two homegirls" in the apartment. (*Id.* at 01:06–1:32.)

---

[1] When citing to the appendices provided by the parties in support of their summary judgment motions, the Court cites to the docket number (*e.g.*, Doc. # 144-1) and the page number of the appendix, using the numbering system applied by the party (*e.g.*, Doc. # 144-1 at 10, using Respt's App.0010 as the applicable page number).

Mr. Bruno was cooperative and allowed the Officers to come into his apartment. (*Id.* at 01:26–01:58; Doc. # 144-1 at 6, 42.) He provided the Officers with his ID. (Doc. # 123-2, Patterson BWC 1 at 01:35–01:46.) In the living room of the apartment, a female juvenile ("A.S.") was sitting on the floor and an adult female, Nancy Dorado, was sitting on the sofa with the TV on. (*Id.* at 01:48–02:06.) Officer Patterson asked if anyone was hurt and if the two females were okay, and both of them responded that they were fine. (*Id.* at 02:09–02:20; 02:40–02:46.) Neither A.S. nor Dorado displayed signs of distress. (*Id.* at 02:20–02:45.) A.S. told the Officers that she was 16 years old, that her legal guardian, who was her grandmother, resided in Texas, and that her father and uncle lived in Colorado Springs. (*Id.* at 03:23–03:27; Doc. # 123-1, Archer BWC at 03:28–03:50.)

Defendants assert that the Officers perceived the apartment to be "sparsely furnished" as if it was not being lived in. (Doc. # 123 at 8.) However, Plaintiff disputes this assertion and notes that the apartment contained, among other things, a couch, a lamp, a TV, a bicycle, a bed, a dresser, a night table, a closet full of clothes, shelves that contained toiletries and towels in a hallway, and a shower curtain and shower products in the bathroom. (Doc. # 144 at 3.) Further, when the Officers asked Mr. Bruno how long he had lived in the apartment, Mr. Bruno said he had lived there about three or four weeks. (Doc. # 123-2, Patterson BWC 1 at 06:02–06:12.) Defendants also assert that A.S. was wearing "a tight-fitting, lacy, low cut tank top" and was "provocatively dressed." (Doc. # 123 at 1, 8.) Plaintiff disputes "Defendants' attempt to sexualize A.S. by labeling her as 'provocatively dressed'" and notes that A.S. was also wearing

sweatpants. (Doc. # 144 at 4.) The body worn camera shows A.S. wearing sweatpants, a tank top, and a blanket wrapped around her shoulders. *See, e.g.*, (Doc. # 123-2, Patterson BWC 1 at 11:30–13:20.)

The Officers spent approximately the next 16 minutes speaking with Mr. Bruno, A.S., and Ms. Dorado. Officer Archer testified in his deposition that during this time, "everyone had been pretty cooperative and things were pretty calm." (Doc. # 144-1 at 42.) Officer Patterson explained to the three occupants of the apartment that he was asking questions and needed to get in contact with A.S.'s parents because it was about 1:00 a.m. and she was 16 years old in an apartment with two adults. (Doc. # 123-2, Patterson BWC 1 at 07:55–08:20.) Mr. Bruno explained that he knew A.S. through a friend from high school. (*Id.* at 08:05–08:15.) A.S. provided a phone number for her father, but no one answered when Officer Patterson called the number. (*Id.* at 08:20–09:16; 10:40–11:08.)

Officer Patterson then asked A.S. to come talk with him in the hallway. (*Id.* at 11:15–11:25.) A.S. stated that she was living with Ms. Dorado at the time, denied being a runaway, and said she would call her uncle who also lives in Colorado Springs. (*Id.* at 11:30–13:20.) A.S. then returned inside the apartment and told Officer Archer that she got in touch with her uncle, who said that he would come pick her up but it would take about 15 minutes. (Doc. # 123-1, Archer BWC at 16:00–16:24.) A.S. also asked Officer Archer if she could "smoke a bowl" of marijuana. (*Id.* at 17:04–17:12.)

While Officer Patterson was out in the hallway on a phone call, he saw Mr. Melvin at the exterior door of the apartment building. (Doc. # 123-6 at 37–38.) Officer

Patterson opened the door for him and asked Mr. Melvin if he was going to apartment 211. Individual Defendants assert, and Plaintiff disputes, that Mr. Melvin said no, then "immediately ran" to apartment 211, opened the door, entered the apartment, "slammed the door shut," and locked it.[2] (*Id.* at 74; *see also id.* at 37–41.) Officer Patterson, from the hallway, screamed "Josh" to alert Officer Archer, who was still inside the apartment. (*Id.* at 74.)

Officer Archer's body worn camera footage captured when Mr. Melvin arrived in the apartment. (Doc. # 123-1, Archer BWC at 17:57–18:15.) Officer Archer immediately ordered Mr. Melvin away from the door, and Mr. Melvin complied, expressing surprise and asking, "Who's Josh?" (*Id.*) Mr. Melvin moved away, and Mr. Bruno assisted in unlocking the door. (*Id.* at 18:10–18:17.) At most, approximately 5-10 seconds passed before Mr. Melvin moved away from the door, and less than 20 seconds passed before the door was unlocked and Officer Patterson was able to re-enter the apartment. *See* (*Id.* at 17:58–18:17.)

Officer Patterson re-entered the apartment and immediately ordered Mr. Melvin to turn around and put his hands behind his back. (*Id.* at 18:17–18:25.) The Officers began yelling and grabbing for Mr. Melvin in the entryway. (*Id.* at 18:25–18:34.) The scene quickly became chaotic. When Mr. Melvin did not turn around and put his hands behind his back, the Officers grabbed his arms and struggled with him further into the

---

[2] Although almost all of above the described events are captured by the Officers' body worn camera footage, there does not appear to be any video of Officer Patterson letting Mr. Melvin into the building, their communication, or Mr. Melvin "running" to the apartment and "slamming" the door closed. Plaintiff disputes Officer Patterson's characterization of these events on the basis that there is no video showing the events. (Doc. # 144 at 5.)

apartment. (*Id.* at 18:30–18:52.) Officer Patterson grabbed Mr. Melvin's arm and chest and pointed his OC canister (pepper spray) at Mr. Melvin. (*Id.* at 18:44–18:59.) The Officers struggled with Mr. Melvin for a little over a minute, during which time at least one Officer and at times both of them had hands on Mr. Melvin. (*Id.* at 18:30–19:49.) Individual Defendants concede that Mr. Melvin did not initiate any physical contact; he never attempted to hit, kick, bite, or spit at the Officers; and he never threatened anyone. (Doc. # 144 at 11; Doc. # 153 at 2.) The parties dispute whether Mr. Melvin "twice tried to jump head first out of the second story window of the apartment" during the struggle. *Compare* (Doc. # 123 at 15) *with* (Doc. # 144 at 6). Body worn camera footage shows that Mr. Melvin held on to the windowsill while resisting and attempted to put his foot up near the windowsill. (Doc. # 123-1, Archer BWC at 18:56–19:21.) Mr. Melvin also repeatedly yelled for Mr. Bruno to "help" him. (*Id.* at 19:21, 19:26, 19:41, 19:57, 20:06, 20:50.) Officer Patterson used his OC spray on Mr. Bruno after Mr. Bruno reportedly jogged in place and balled his fists, which Officer Patterson "interpreted as pre-attack indicators."[3] (Doc. # 123-6 at 75, 100–03.)

After struggling with Mr. Melvin for a little over one minute, Officer Patterson ordered Officer Archer to tase Mr. Melvin. (Doc. # 123-1, Archer BWC at 19:48–53.) Officer Archer deployed a Taser cartridge at Mr. Melvin for a 5-second Taser cycle while Officer Patterson was holding him, and Mr. Melvin made a sound of pain. (*Id.* at 19:52–19:57.) Less than 5 seconds later, Officer Archer deployed a second Taser cartridge at

---

[3] The body worn camera footage does not show Mr. Bruno's actions immediately before he is sprayed.

Mr. Melvin for another 5 seconds. (*Id.* at 20:02–20:07.) Mr. Melvin cried out in pain and

said he had asthma. (*Id.*) 20 seconds later, while Officer Patterson was holding Mr.

Melvin's arms behind his back, Officer Archer tased him a third time by sending 5

seconds of charge through the already connected probes. (*Id.* at 20:27–20:32.) Mr.

Melvin again reacted in pain. (*Id.*) 12 seconds later, while Officer Patterson was holding

Mr. Melvin's hands behind his back with one arm and had his second arm around the

front of Mr. Melvin's neck, Officer Archer deployed his Taser for a fourth 5-second cycle.

(*Id.* at 20:44–20:49.) 11 seconds later, Officer Archer tased Mr. Melvin a fifth time while

Officer Patterson continued to hold him and struggle with him on the ground. (*Id.* at

21:00–21:05.)

Less than 15 seconds later, Officer Patterson pushed Mr. Melvin away from him

and deployed OC spray into Mr. Melvin's face. (*Id.* at 21:15.) Mr. Melvin attempted to

flee and ran towards the entryway of the apartment. (*Id.* at 21:17–21:25.) Officer

Patterson deployed his first Taser cartridge at Mr. Melvin and then immediately

deployed his second Taser cartridge one second later. (*Id.* at 21:19–21:28.) The effect

of the Taser forced Mr. Melvin to the ground and incapacitated him for 5 seconds. (*Id.*)

Mr. Melvin then stood up, batted the Taser wires away from him, and ran from

the apartment. (*Id.* at 21:28–21:37.) The Officers chased Mr. Melvin outside and down

the street, where he collapsed about 35 seconds later. (*Id.* at 21:35–22:09.) During the

time that he was being held down by the Officers, Mr. Melvin said things like, "You're

killing me. You're honestly killing me"; "I can't breathe"; You've gotta get off. You've

gotta get off"; and "I've honestly got asthma." (*Id.* at 22:07–23:20.) While Mr. Melvin lay

with an arm underneath his body, Officer Patterson struck Mr. Melvin in the abdomen area twice with his elbow to force him to put his hands behind his back. (Doc. # 123-6 at 29–31.) Mr. Melvin was then handcuffed.

Throughout the encounter with Mr. Melvin in the apartment and on the street, the Officers issued dozens of commands to Mr. Melvin: to stop resisting, to lay down on the ground, to give up his hands, etc. (Doc. # 123 at 16.) Plaintiff admits that during certain parts of the encounter, Mr. Melvin had time to follow certain commands. (Doc. # 144 at 6.) However, Plaintiff disputes that Mr. Melvin had time or ability to comply with commands before every separate Taser deployment or use of force, particularly given the rapid sequence of the deployments and that, at times, the Officers were holding him so tightly that it was impossible for him to move to comply. (Doc. # 144 at 6–7.) The parties also dispute whether Mr. Melvin was "erratic and irrational and possessed super-human strength and stamina." *Compare* (Doc. # 123 at 16), *with* (Doc. # 144 at 7). Plaintiff contends that other than attempting to leave the apartment, Mr. Melvin did not behave erratically or irrationally. (Doc. # 144 at 7.)

After being handcuffed, Mr. Melvin was transported to the hospital. He was pronounced dead on May 2, 2018, at age 27. (Doc. # 144-1 at 105.) The coroner determined that the manner of Mr. Melvin's death was homicide and that Mr. Melvin "died as a result of complications of sickle cell trait and extreme exertion during confrontation with police and associated *Taser* deployment." (*Id.*) A blood test from the morning Mr. Melvin arrived at the hospital indicated that he was negative for all illicit substances. (*Id.* at 111.)

B.    TASER CONNECTIONS

It is undisputed that in the time period of less than two minutes described above,

Officer Archer deployed his Taser 5 times, Officer Patterson deployed his Taser 3 times,

and Officer Patterson sprayed Mr. Melvin with OC spray. (Doc. # 123 at 12.) However,

the parties dispute (1) how many of these Taser deployments had a "good connection"

or were "effective" and (2) whether the Officers reasonably believed that only one Taser

deployment was effective. *Compare, e.g.*, (Doc. # 123 at 12–13), *with* (Doc. # 144 at 5–

6), *and* (Doc. # 174 at 4.) Defendants contend that Taser downloads analyzed after the

incident in an internal memorandum ("IA Memo") showed a total of 8 Taser

deployments, with only 4 having "good connections." (Doc. # 153 at 3) (citing Doc. #

146-1 at 2, 8–19). Plaintiff, however, argues that the same IA Memo indicates that

"there were a total of four [Taser] cartridges and eight prongs that made connection and

five deployments with good connections." (Doc. # 144 at 13) (citing Doc. # 144-1 at 97).

In addition, Defendants define an "effective Taser deployment" as "one which causes

neuromuscular incapacitation ("NMI") or otherwise enables officers to handcuff the

individual." (Doc. # 123 at 13.) Accordingly, Defendants contend that the Officers

reasonably believed that only one of their Taser deployments was "effective" (the

second Taser deployment by Officer Patterson and seventh overall) because Mr. Melvin

"actively resisted during all other Taser deployments." (*Id.*) Plaintiff disputes that a Taser

deployment under this definition is "ineffective" because "it still can inflict excruciating

pain." (Doc. # 144 at 5–6). Plaintiff also disputes that any reasonable officer would have

believed that only one deployment had a "good connection" or "produced any effect" because Mr. Melvin was clearly in pain due to several of the deployments. (*Id.* at 6.)

## C.   TRAINING[4]

Individual Defendants Patterson and Archer were Colorado Springs Police Department ("CSPD") police recruits in the CSPD Training Academy class that ran from October 2016 through April 2017. (Doc. # 150 at 2–3.) In conducting training of recruits, Defendant City of Colorado Springs ("the City") follows the standards established by Peace Officer Standards and Training ("POST"), a unit of the Colorado Attorney General's Office. (Doc. # 150-1 at 7.) In 2016, CSPD devoted 100 hours to Arrest Control training, over the 64 hours required by POST. (*Id.*) Both Officers Patterson and Archer passed the CSPD Academy's Arrest Control Program. (*Id.* at 8.)

The City trained and certified recruits on the use of a Taser according to materials created by TASER International, Inc./AXON Enterprise, Inc. (Doc. # 150 at 9.) The training included use of the 220-page TASER PowerPoint, voluntary Taser exposures, and Taser manipulations, draws, and scenarios. (*Id.* at 10.) The City asserts that it also trained its sworn officers on Taser use annually, which included instruction, the TASER/AXON annual update PowerPoint, and live Taser cartridge deployment under practical scenarios. (*Id.*) Plaintiff disputes that the City adequately trained its officers on Tasers annually and notes that Defendant Archer testified that he did not

---

[4] The Court has fully considered all of the facts asserted in the parties' respective briefing. (Docs. # 150, 165.) In the interest of brevity, the Court confines its recitation herein to the material facts relevant to its analysis of Plaintiff's inadequate training municipal liability claim.

recall having training specifically related to Taser use after the academy. (Doc. # 165 at 3; Doc. # 165-1 at 6.)

The parties appear to dispute certain national standards regarding Taser application. However, both parties cite guidelines established by the Police Executive Research Forum ("PERF") as "nationally accepted standards" for policing. The 2011 Electronic Control Weapon Guidelines, set forth by PERF and The Office of Community Oriented Policing Services ("COPS") within the Department of Justice, advise that repeated or multiple Taser applications may increase risk of death. (Doc. # 174-1 at 104.) The guidelines state:

> Personnel should be trained to use [a Taser] for one standard cycle (five seconds) and then evaluate the situation to determine if subsequent cycles are necessary. Training protocols should emphasize that multiple applications or continuous cycling of [a Taser] resulting in an exposure longer than 15 seconds (whether continuous or cumulative) may increase the risk of serious injury or death and should be avoided.

(Doc. # 174-1 at 109.) The Guidelines further provide that "[a]ny subsequent applications should be independently justifiable, and the risks should be weighed against other force options." (*Id.* at 111.)

The City trained its officers that when using a Taser on a person, "the officer should deploy the TASER and then observe the person's reaction to determine whether the deployment was effective in causing neuromuscular incapacitation ("NMI") or otherwise enabling an officer to handcuff the person." (*Id.* at 11.) Further, the City trained its officers that "where an officer deploys the TASER at a person and the person continues to actively resist, does not exhibit the effects of NMI, and continues to talk during the 5-second deployment, then the officer should conclude that the TASER

11

deployment was ineffective, and that the TASER may not have a good connection with the person." (*Id.*) The City trained its officers that Taser deployment was justified when a subject displayed "active resistance," and its policy defines active resistance as:

> Physically evasive movements to defeat an officer or marshal's attempt to control, including, but not limited to, bracing, tensing, pushing, flailing arms, running away, or verbally signaling an intention to avoid or prevent being taken into or retained into custody. Active Resistance also includes attempting to avoid apprehension and failing to comply with an officer or marshal's order to reveal themselves from concealment or surrender. Walking away may be considered active resistance if the person continues to walk away from an officer or marshal after having been given a lawful order or having been told the person is under arrest.

(Doc. # 165 at 10; Doc. # 167-3 at 173.) Plaintiff contends that this definition is so broad that "almost any action or statement could qualify" as active resistance and that the City training therefore authorizes the use of excessive force by Taser when such use is constitutionally prohibited. (Doc. # 165 at 10.)

The City asserts that it trained its police officer and recruits that they should try to limit a person's time under the power of a Taser to a total of 15 seconds or three cycles, but 15 seconds "is not a hard limit" and "[t]he circumstances can provide the added justification to deploy a TASER on a person more than three times." (Doc. # 174 at 5; Doc. # 150-1 at 21.) "Additional justification" is not defined in CSPD policy. (Doc. # 174 at 5.) Plaintiff disputes that CSPD officers were trained to seriously consider three Taser deployments or 15 seconds of tasing as a real limit. (Doc. # 165 at 5.) Defendant Archer testified in his deposition that "there wasn't like any specific number saying that this is the exact amount of times you can tase someone." (Doc. # 165-1 at 10.) He further testified, "I don't recall anything stating that it was unsafe to tase someone past three

times. The only thing I recall from that policy was the number three was in there, and then there were exceptions to going past that number, but there was no set limit on the amount of times you can tase someone." (*Id.*) Current CSPD Chief Adrian Vasquez, who at the time was Deputy Chief and oversaw the internal affairs investigation into the Officers' conduct, testified that it is reasonable for officers to deploy a Taser "multiple times" depending on the officer's assessment of the situation. (*Id.* at 27, 30.)

With respect to the encounter in this case, an internal investigation stated that Officer Archer "was unable to clearly articulate his reasons for deploying his taser other than Officer Patterson had told him to." (Doc. # 167-4 at 2.) Both Officers also testified that they thought the number of Taser deployments was significantly less than 8: Officer Archer testified at his deposition that he thought he deployed his own Taser three times and Officer Patterson deployed his Taser once. (Doc. # 165-1 at 4–5.) Officer Patterson testified that he was not specifically aware of how many times Officer Archer deployed his taser, and he stated in a Use of Force Report filed on the day of the encounter that he "tazed [Mr. Melvin] once" and "[a]nother officer attempted to taze him twice but was unsuccessful." (*Id.* at 122–23; Doc. # 167 at 202.) CSPD Chief Peter Carey testified that with respect to the encounter in this case, the Officers needed to evaluate each deployment regarding whether it was effective, meaning whether it achieved NMI, but he did not believe that the 8 Taser deployments used in this case was unreasonable or outside of the policy. (Doc. # 165-1 at 20–21.)

The Officers testified that that they used their Tasers on Mr. Melvin in accordance with the training that CSPD provided. (Doc. # 165-1 at 9, 90–91, 152.) The

Officers' supervisors, current Chief Vasquez and former Chief Carey, also testified that

the Officers acted according to CSPD training. (*Id.* at 17–22; 27–28.) Further, the City's

investigation into the Officers' conduct exonerated both their use of force and

specifically their use of Tasers. (Doc. # 167-6 at 212.)

D.     **PROCEDURAL HISTORY**

Plaintiff initiated this lawsuit on April 8, 2020. (Doc. # 1.) In the Amended

Complaint, Plaintiff asserts one claim of excessive force in violation of the Fourth

Amendment against Officers Patterson and Archer in their individual capacities and

against the City of Colorado Springs. (Doc. # 30 at 15.) Individual Defendants Patterson

and Archer filed their Motion for Summary Judgment on August 11, 2022 (Doc. # 123),

and Defendant City of Colorado Springs filed its Motion for Summary Judgment on

November 21, 2022 (Doc. # 150). Both motions are fully briefed and ripe for review.

(Docs. ## 144, 146, 153, 165, 167, 174.)

## II.     <u>LEGAL STANDARD</u>

Summary judgment is warranted when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper

disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*,

259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such

that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v.*

*Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for

summary judgment, a court must view the evidence in the light most favorable to the

non-moving party. *See id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in his favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671.

### III.   <u>DISCUSSION</u>

### A.   INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

First, the Court will address Individual Defendants Patterson and Archer's argument that they are entitled to qualified immunity and summary judgment on Plaintiff's excessive force claim. (Doc. # 123 at 4.)

1.   <u>Applicable Law</u>

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). When a section 1983 defendant raises a qualified immunity defense, the plaintiff bears the burden of overcoming it. *Simpson v. Little*, 16 F.4th 1353, 1359 (10th Cir. 2021). "At summary judgment, the plaintiff must (1) raise a genuine issue of material fact that the defendant violated a federal constitutional or statutory right, and (2) show the right was clearly established at the time of the defendant's violative conduct." *Id.*

Claims that police used excessive force during a seizure are analyzed under the Fourth Amendment's reasonableness standard. *See Huff v. Reeves*, 996 F.3d 1082, 1089 (10th Cir. 2021). Whether force was objectively reasonable turns on (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The Court must consider the totality of the circumstances and apply the factors "from the perspective of

a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,"
keeping in mind "that police officers are often forced to make split-second judgments—
in circumstances that are tense, uncertain, and rapidly evolving—about the amount of
force that is necessary in a particular situation." The totality of the circumstances
analysis also includes assessing whether an officer unnecessarily created the use of
force. *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004) ("The
reasonableness of the use of force depends not only on whether the officers were in
danger at the precise moment that they used force, but also on whether the officers'
own 'reckless or deliberate conduct during the seizure unreasonably created the need
to use such force.'" (quoting *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th
Cir. 1995))).

2.   <u>Violation of a Constitutional Right</u>

Applying the *Graham* factors to the circumstances of this case, the Court finds
that Plaintiff has presented a triable issue as to whether the Officers unreasonably used
excessive force in violation of Mr. Melvin's rights under the Fourth Amendment.

a.   *Severity of the Crime*

With respect to the first *Graham* factor, the severity of the crime, Individual
Defendants argue that they reasonably suspected Mr. Melvin of a multitude of felonies
and other crimes, including "burglary, trespass, human trafficking of a minor for sexual
servitude, procurement of a child for sexual exploitation, and contributing to the
delinquency of a minor." (Doc. # 123 at 15.) "Reasonable suspicion accrues when an
officer possesses a 'particularized and objective basis for suspecting criminal conduct

under the totality of the circumstances.'" *United States v. Cortez*, 965 F.3d 827, 834

(10th Cir. 2020) (quoting *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015)).

Upon carefully reviewing the undisputed facts in this case, the Court agrees with

Plaintiff that the suspicions asserted by Individual Defendants are speculative at best

and fall well short of objective reasonableness.

First, the Court finds it implausible that the Officers had reasonable suspicion to

believe that Mr. Melvin was involved in illegal conduct concerning A.S. The Court is

skeptical that the Officers had reasonable suspicion of any illegal conduct involving

A.S., particularly given that she provided a reasonable explanation for her presence,

she was not in distress and said she was okay, and she told the Officers that she would

call her uncle to come pick her up. Even if the Court were to accept Individual

Defendants' disputed assertions that A.S. was "provocatively dressed" and that the

apartment was "sparsely furnished" so as to suggest it was a brothel used for sex

trafficking, (Doc. # 123 at 1, 8), there is no evidence that *Mr. Melvin* had any association

with A.S. *See United States v. Cortez*, 449 U.S. 411, 417–18 (1981) ("[D]etaining

officers must have a particularized and objective basis for suspecting the **particular**

**person** stopped of criminal activity." (emphasis added)). Because there is no evidence

connecting Mr. Melvin and A.S., the Court finds that the Officers lacked any basis to

suspect Mr. Melvin of any crimes, let alone significant felonies, involving A.S.

The Court also finds that there is insufficient evidence to support Individual

Defendants' asserted suspicions of felony burglary, felony trespass, assault, and

harassment. (Doc. # 123 at 6–7.) Aside from the Officers observing Mr. Melvin exit the

building earlier when he opened the door to allow them in, there is no evidence linking Mr. Melvin to the fight that had occurred in apartment 211. The officers had no description of the individuals that Mr. Bruno had "kicked out," either from Mr. Bruno or dispatch. Moreover, when Mr. Melvin entered the apartment, none of the three individuals in apartment 211 made any statements identifying Mr. Melvin as a person who had been in a fight or kicked out earlier. To the contrary, the body worn camera shows that Mr. Bruno reacted calmly to Mr. Melvin's arrival, with no signs of surprise or distress at his entrance.

For similar reasons, the Court finds that it was not reasonable to suspect Mr. Melvin of felony trespass and felony burglary for entering apartment 211 without Mr. Bruno's permission. Even accepting as true Individual Defendants' disputed assertion that Mr. Melvin "lied" to Officer Patterson that he was going to apartment 211 and "then immediately ran to apartment number 211, opened its door, entered the apartment, and slammed the door shut," (Doc. # 123-6 at 74), the Court finds that such conduct alone does not support reasonable suspicion for felony burglary and felony trespass. A person commits felony burglary when he "knowingly unlawfully enters" a dwelling "with intent to commit therein a crime" or "assaults or menaces any person."[5] Colo. Rev. Stat. § 18-4-202. Mr. Bruno's apparent acceptance of Mr. Melvin's arrival, without any reaction of alarm or surprise, undercuts any "suspicion" that Mr. Melvin entered apartment 211 unlawfully or without permission. Moreover, the evidence does not support reasonable

---

[5] Felony trespass also requires a person to knowingly and unlawfully enter or remain in a dwelling of another. Colo. Rev. Stat. § 18-4-502(1)(a).

suspicion that Mr. Melvin entered with intent to commit a crime or assault or menace any person.

At most, even viewing the facts in the light most favorable to the Officers, Mr. Melvin's conduct merely demonstrated his intent to avoid Officer Patterson and enter apartment 211. *See Cortez*, 965 F.3d at 835 (observing that courts "routinely discount individuals' reactions to encountering law enforcement when they can be easily explained as the type of common response triggered by a police interaction"). Individual Defendants argue that this conduct, at minimum, created reasonable suspicion that Mr. Melvin was obstructing a peace officer or interfering with their active investigation. Colorado law provides that a "person commits obstructing a peace officer . . . when, by using or threatening to use . . . an obstacle, such person **knowingly** obstructs, impairs, or hinders the enforcement of the penal law or the preservation of the peace by a peace officer." Colo Rev. Stat. § 18-8-104(1)(a) (emphasis added). The Court is skeptical that it was reasonable to suspect Mr. Melvin of obstruction or interference when he "ran" from Officer Patterson and locked the door to apartment 211, particularly because (1) there is no evidence that Mr. Melvin was aware that Officer Archer was inside the apartment at the time, and (2) the evidence is disputed whether Mr. Melvin had any reason to believe that apartment 211 was involved in an investigation such that "locking" Officer Patterson out would obstruct or interfere with Officer Patterson's work as a peace officer. Further, any suspicion of "obstruction" is belied by the fact that Mr. Melvin quickly complied with Officer Archer's order and moved away from the door, allowing

Officer Patterson to re-enter. Any "obstruction" was therefore temporary and quickly remedied.

The Court is doubtful that the Officers had a particularized and objective basis for suspecting Mr. Melvin of any criminal activity when Officer Patterson re-entered the apartment and immediately attempted to detain him. However, even if the Court were to find that the Officers has reasonable suspicion of "obstruction," obstructing a peace officer is only a class 2 misdemeanor. Colo. Rev. Stat. § 18-8-104(4). The Tenth Circuit has made clear that a "minor offense—at most—support[s] the use of minimal force." *Perea v. Baca*, 817 F.3d 1198, 1203 (10th Cir. 2016). The first *Graham* factor therefore weighs in Plaintiff's favor.

> b.     *Immediate Threat*

The Court finds that the second *Graham* factor, whether Mr. Melvin posed an immediate threat to the safety of the officers or others, also weighs in Plaintiff's favor. There is no evidence showing that Mr. Melvin posed an immediate threat to the safety of himself or others before the Officers attempted to detain him. *See* (Doc. # 123 at 15–16.) He did not issue any verbal or physical threats, the Officers did not observe him carrying any weapons, and he was not physically aggressive towards anyone. Instead, "any threat posed stemmed from [Mr. Melvin] resisting arrest" *after* Officer Patterson ordered him to turn around and put his hands behind his back and he failed to comply. *Perea*, 817 F.3d at 1203. Mr. Melvin's "physical reaction to an unexplained arrest is properly considered under the third *Graham* factor." *Id.*

### c.    Resisted Arrest or Attempted to Flee

The third factor, whether Mr. Melvin resisted arrest or attempted to flee, weighs in favor of the use of some force during the period in which Mr. Melvin was resisting. "However, the relevant inquiry is whether the taser use was reasonable and proportionate given [Mr. Melvin's] resistance." *Id.*; *see also Cortez v. McCauley*, 478 F.3d 1108, 1126 (10th Cir. 2007) ("[T]he excessive force inquiry evaluates the use of force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case."). The Court finds that a reasonable jury could conclude that the Officers' actions in deploying their tasers 8 times in less than two minutes violated Mr. Melvin's rights under the Fourth Amendment.

The Court notes that the Officers became "hands on" with Mr. Melvin almost immediately after he entered the apartment. The body worn camera shows that when Officer Patterson re-entered the apartment, he ordered Mr. Melvin to turn around and put his hands behind his back. (Doc. # 123-1, Archer BWC at 18:18–18:30.) Within seconds of making that order, when Mr. Melvin failed to immediately comply, the Officers began grabbing at Mr. Melvin's arms and jacket and struggling with him deeper into the apartment. (*Id.*; Doc. # 123-3, Patterson BWC 2 at 00:00–00:08). It is undisputed that during approximately the next minute, Mr. Melvin resisted arrest, struggled with the Officers, and failed to comply with repeated commands to stop, to get down, and to put his hands behind his back. He also called for help from Mr. Bruno. Based on these facts, and assuming without deciding that the detention was lawful, the

use of *some force* was reasonable to subdue and detain Mr. Melvin. *See, e.g.*, *Perea*, 817 F.3d at 1203 (acknowledging that "use of some force against a resisting arrestee may be justified").

However, Mr. Melvin did not resist or fight back in such a way to place the officers in immediate danger or otherwise justify the severe force ultimately used. *See id.* (observing that resistance of "thrashing and swinging a crucifix" did not justify the "severe response" of being tased 10 times in two minutes). Individual Defendants concede that Mr. Melvin did not initiate any physical contact; he never attempted to hit, kick, bite, or spit at the Officers; and he never threatened anyone. (Doc. # 144 at 11; Doc. # 153 at 2.) Further, Individual Defendants' assertion that Mr. Melvin also "twice tried to jump head first out of the window," which was on the second floor of the apartment building, is disputed. (Doc. # 123 at 17.) The body worn camera shows that Mr. Melvin put his foot up near the window, but a reasonable jury could determine that this conduct was simply part of Mr. Melvin's physical resistance to being arrested and not an attempt to "jump head first out of the window." The body worn camera shows that Mr. Melvin's resistance was not aggressive or violent toward the Officers or anyone else in the apartment; he merely used his body movements to resist being handcuffed and attempted to flee from the Officers. *See Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010) (acknowledging that "resistance" is not "a binary state" of "either completely passive or active"; rather, it "runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer").

Even if the detention was lawful and the first Taser deployment was justified by the physical struggle and Mr. Melvin's resistance to being handcuffed, the Court finds that the repeated Taser deployments over the next 90 seconds—several of which occurred within mere seconds of each other, allowing little time for Mr. Melvin to recover and comply with orders—were not justified by the totality of the circumstances based upon the undisputed facts. A reasonable jury could determine that the Officers' repeated Taser deployments in such quick succession against a resisting but non-violent arrestee were violative of Mr. Melvin's rights under the Fourth Amendment. Moreover, the Court finds that there are genuine disputes of material fact precluding summary judgment with respect to the 8 Taser deployments, including but not limited to (1) whether the Officers reasonably perceived only one of the Taser deployments to be "effective"; (2) how many of the Taser deployments had a "good connection"; and (3) whether Mr. Melvin had adequate time or ability to comply with the Officers' orders prior to each Taser deployment. A reasonable jury could also find that the Officers unreasonably and immediately escalated the situation at several critical junctures, thus creating the need to use force and causing Mr. Melvin to instinctively attempt to flee from repeated Taser shocks. *See Smith v. Ray*, 781 F.3d 95, 104 (4th Cir. 2015) (observing that force may be excessive "based on the simple fact that the officer took a situation where there was obviously no need for the use of any significant force and yet took an unreasonably aggressive tack that quickly escalated it to a violent exchange when the suspect instinctively attempted to defend himself"); *Andersen v. City of Colorado Springs*, No. 20-cv-02032-RBJ, 2022 WL 910952, at *6 (D. Colo. Mar. 29, 2022) (finding that "the

totality of the officer's actions also show that he created the need to use force by escalating the interaction at every turn").

For these reasons, the Court finds that the *Graham* factors weigh in favor of Plaintiff and that Plaintiff has established a triable issue as to whether Individual Defendants violated Mr. Melvin's rights under the Fourth Amendment. *Simpson*, 16 F.4th at 1359. It will be up to the jury to resolve the genuine disputes of material fact and determine whether the Officers' conduct was unconstitutional under the totality of the circumstances.

    3.   <u>Clearly Established</u>

The Court must next address whether it was clearly established that the Officers' actions constituted excessive force. "A clearly established right is one that is sufficiently clear that every reasonable officer would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotations omitted). "A Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can clearly establish a right," *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018), but a case directly on point is not required so long as "existing precedent [has] placed the statutory or constitutional question beyond debate," *White v. Pauly*, 580 U.S. 73, 79 (2017); *see York v. City of Las Cruces*, 523 F.3d 1205, 1212 (10th Cir. 2008) (explaining that clearly established law "does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity whenever we have a new fact pattern" (quotations omitted)). "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is

required from prior case law to clearly establish a violation." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007).

The Tenth Circuit has addressed the use of a Taser in several excessive force cases. In *Casey*, the Tenth Circuit held that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance." *Id.* at 1286. In *Perea*, the Tenth Circuit held that it was excessive for officers to use a Taser 10 times against a suspect, particularly after he was effectively subdued and brought under the officer's control. 817 F.3d at 1204. The court stated that it "is not reasonable for an officer to repeatedly use a taser against a subdued arrestee they know to be mentally ill, whose crime is minor, and who poses no threat to the officers or others." *Id.* It is also clearly established that officers may not use a Taser on a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning. *See Cavanaugh v. Woods Cross City*, 625 F.3d 661, 667 (10th Cir. 2010).

The Court acknowledges that the above cases are distinguishable in part because in each of the cases, the suspect was either subdued or not resisting arrest. In line with this precedent, if the Officers' attempt to detain Mr. Melvin was determined to be lawful, then Plaintiff likely could not show that it was clearly established that the Officers' *first* use of the Taser on Mr. Melvin in an attempt to subdue him was excessive. *See, e.g.*, *Perea*, 817 F.3d at 1203 (acknowledging that officers may use some force to effect an arrest of a misdemeanant); *Waters v. Coleman*, 632 F. App'x 431, 438 (10th Cir. 2015) (determining that an officer who used a Taser twice on a resisting detainee

was entitled to qualified immunity). Nevertheless, the critical issue in this case arises from the *multiple*, *repeated* deployments of a Taser against Mr. Melvin in quick succession and under circumstances in which it is disputed whether he had adequate time or ability to comply with orders and avert the next Taser deployment. It is "clearly established law in the Tenth Circuit that the use of disproportionate force to arrest an individual who is not suspected of committing a serious crime and who poses no threat to others constitutes excessive force." *Perea*, 817 F.3d 1198; *see Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008). While there is no specific limit on the number of times an arrestee may be tased within a given time interval, the Court is satisfied that the above Tenth Circuit cases have clearly established that disproportionate use of a Taser on a nonviolent arrestee not suspected of a serious crime constitutes excessive force. *See Perea*, 817 F.3d at 1203 ("Repeated use of the taser exceeded the minimal force that would be proportional to Perea's crime.").[6]

In sum, the Court concludes that a reasonable officer would have understood that deploying a Taser 8 times in approximately 90 seconds at Mr. Melvin, under the circumstances of this case, was violative of the Fourth Amendment. Individual Defendants are not entitled to qualified immunity, and the Court denies their Motion for Summary Judgment (Doc. # 123).

---

[6] In *Perea*, the Tenth Circuit declined to "set a specific limit on the number of times an arrestee may be tased within a given time interval." 817 F.3d at 1205 n.4. However, the court stated that it was "deeply troubled by the sheer number of times the officers deployed the taser in under two minutes." *Id.*

**B.     THE CITY'S MOTION FOR SUMMARY JUDGMENT**

Next, the Court turns to the City's argument that it is entitled to summary

judgment on Plaintiff's municipal liability claim for failure to adequately train officers.

1.     Applicable Law

A plaintiff suing a municipality under 42 U.S.C. § 1983 for the actions of one of its

officers must prove (1) a municipal employee committed a constitutional violation, and

(2) a municipal policy or custom was the moving force behind the constitutional

deprivation. *Myers v. Okla. Cnty. Bd. of Cnty. Com'rs*, 151 F.3d 1313, 1318 (10th Cir.

1998) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). A municipal

policy or custom can take the form of "the failure to adequately train or supervise

employees, so long as that failure results from 'deliberate indifference' to the injuries

that may be caused." *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)

(internal quotation marks and citations omitted). The Tenth Circuit has established a

four-part test for a plaintiff to establish a municipality's liability for inadequate training on

the use of force:

> A plaintiff must show (1) the officers exceeded constitutional limitations on
> the use of force; (2) the use of force arose under circumstances that
> constitute a usual and recurring situation with which police officers must
> deal; (3) the inadequate training demonstrates a deliberate indifference on
> the part of the city towards persons with whom the police officers come
> into contact; and (4) there is a direct causal link between the constitutional
> deprivation and the inadequate training.

*Myers*, 151 F.3d at 1318 (quoting *Allen v. Muskogee*, 119 F.3d 837, 841 (10th Cir.

1997)).

2.   <u>Analysis</u>

Because the Court has found a triable issue as to whether the Officers exceeded constitutional limitations on the use of force, the Court finds that Plaintiff has established the first element of the failure to train claim for purposes of resolving the instant summary judgment motion. There also appears to be no dispute as to the second element that the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal—in this case, a domestic disturbance. The Court therefore confines its discussion to the third and fourth elements of the failure to train claim.

The City first argues that Plaintiff cannot prove that the City failed to train its police officers on use of force. (Doc. # 150 at 2.) In support, the City points to its use of force training materials and policies and the training that Officers Patterson and Archer received at the academy. (*Id.* at 2–14.) Plaintiff does not dispute that the City "provided *some* training on use of force." (Doc. # 165 at 15.) However, Plaintiff disputes that this training was adequate or in line with national standards for policing that advise that officers should be trained on the dangers of using a Taser on an individual more than three times or for more than 15 seconds. (*Id.* at 15–16.)

The Court finds that summary judgment in favor of the City is not warranted as to whether the City's training on use of force and Taser use was adequate. Although CSPD's written materials provide that "[a]dditional justification is required for deploying [a Taser] more than 3 times on a single individual," (Doc. # 167-3 at 175), there is a genuine dispute of material fact as to whether Officers Patterson and Archer were

actually trained in accordance with this language. Indeed, Officer Archer testified that he did not recall "anything stating that it was unsafe to tase someone past three times" and that "there was no set limit on the amount of times you can tase someone." (Doc. # 165-1 at 10.) The Officers' supervisors, former Chief Carey and current Chief Vasquez, also testified that officers may repeatedly deploy their Tasers if the officers determine that each Taser use is independently justified after assessing the situation. (*Id.* at 20–21, 34.) Similarly, Carey and Vasquez affirmed that the 8 deployments used in this case were within policy and that the Officers' conduct was reasonable. (*Id.*) A reasonable jury could determine that CSPD did not adequately train the Officers on the dangers of repeated Taser deployments and instead trained Officers that repeated tasings are appropriate if "justified," with "additional justification" apparently undefined and left to the Officer's individual discretion.[7]

Further, the City trained its officers that a Taser deployment is "effective" if it achieves neuromuscular incapacitation. It is unclear whether CSPD trained its officers that the three deployments in the policy include only "effective" Taser deployments (using the NMI definition), or *any* Taser deployments, including those which clearly cause pain but do not achieve NMI. For example, Defendants in this case assert that the Officers reasonably believed that only one of the Taser deployments was "effective"/achieved NMI. The Court cannot discern if the Officers were trained to

---

[7] The personnel investigation states that Officer Archer "was unable to clearly articulate his reasons for deploying his taser other than Officer Patterson had told him to." (Doc. # 167-4 at 180.) Meanwhile, Officer Patterson deployed his Taser (after 5 deployments by Officer Archer) because Officer Patterson "was getting tired and his ability to continue the fight was decreasing" and Mr. Melvin was attempting to leave. (*Id.*)

therefore understand that Mr. Melvin was subject to only one of the three Taser

"deployments" outlined in the policy, notwithstanding that several of the 7 other

deployments clearly caused Mr. Melvin pain.

Accordingly, the Court finds that there are genuine disputes of material fact

precluding summary judgment on the adequacy of the City's training, including but not

limited to:

- whether  CSPD officers' training was markedly different than what was
  provided in the written materials;

- whether Officers Patterson and Archer were trained to seriously consider
  safety risks associated with 3 tasings or 15 seconds of cumulative or
  consecutive Taser deployment;

- whether the Officers were adequately trained on what "additional justification"
  is required for subsequent Taser deployments; and

- whether the Officers were trained that it was appropriate to use a Taser on an
  individual who was "actively resisting" according to a definition of "active
  resistance" that encompasses scenarios in which use of a Taser would be
  excessive force.

The Court also finds that Plaintiff has sufficiently demonstrated that the

inadequate training demonstrates deliberate indifference on the part of the City toward

persons with whom the police officers come into contact. For a failure to train claim, "a

showing of specific incidents which establish a pattern of constitutional violations is not

necessary to put the City on notice that its training program is inadequate." *Allen*, 119

F.3d at 842. Rather, the Tenth Circuit has held that "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability." *Id.* In this case, the Officers stated that they acted in accordance with their training, and their supervisors, former Chief Carey and current Chief Vasquez, affirmed that the Officers acted reasonably and in accordance with CSPD training. It is undisputed that the Officers' use of force in their encounter with Mr. Melvin was exonerated by the City and that the City did not provide any additional or different training on Taser usage because of Mr. Melvin's death. (Doc. # 165 at 12–13; Doc. # 174 at 6.) Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that a reasonable juror could find that the Officers "were trained to act recklessly in a manner that created a high risk of death" and that "the City could reasonably be said to have been deliberately indifferent" to the need for different training on Taser use. *Allen*, 119 F.3d at 844. Plaintiff has therefore satisfied the third element.

Finally, the Court finds that the fourth element—a causal link between the inadequate training and the constitutional violation—is also met in this case. Because the Officers testified that they acted in accordance with their training, a reasonable jury could determine that the Officers would not have used excessive force—*e.g.*, multiple, repeated Taser deployments—had they been trained differently. *See Ortega v. City & Cnty. of Denver*, 944 F. Supp. 2d 1033, 1039 (D. Colo. 2013) (finding the fourth element "easily satisfied" because "a reasonable juror could find that, had Denver implemented a

different training policy on the use of force, Plaintiffs would not have been subjected to the amount [of] force used in this case").

In sum, the Court finds that Plaintiff has met its burden with respect to each of the four elements of the failure to train claim. Summary judgment is therefore not appropriate, and the City's Motion must be denied.[8]

### IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court ORDERS as follows:

- Individual Defendants' Motion for Summary Judgment (Doc. # 123) is DENIED. Individual Defendants are not entitled to qualified immunity on Plaintiff's claim for excessive force under the Fourth Amendment.

- Defendant City of Colorado Springs's Motion for Summary Judgment (Doc. # 150) is DENIED.

DATED:   March 8, 2023

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge

---

[8] The parties also dispute several facts relating to racially disparate use of force. Plaintiff asserts that "racially disparate use of force is not a separate claim, but rather evidence of Defendant's inadequate training and deliberate indifference." (Doc. # 165 at 2.) Defendants contend that such evidence is irrelevant to the excessive force claim and unfairly prejudicial because Plaintiff dropped its equal protection claim. (Doc. # 174 at 8–10.) The Court finds it unnecessary to address these arguments to resolve the instant summary judgment motion. If Plaintiff seeks to introduce evidence of racially disparate use of force, or if the City seeks to exclude such evidence, the parties may raise their arguments in a motion *in limine* or at trial.